STATE OF NORTH CAROLINA v. CELESTE H. VAN LANDINGHAM

No. 55

(Filed 12 July 1973)

**1. Homicide § 21— first degree murder — sufficiency of evidence**

The State's evidence was sufficient for submission to the jury on the issue of defendant's guilt of first degree murder where it tended to show that defendant had lived on the victim's farm for some seven years, the victim had asked defendant to leave the farm a short time before her death, on the date of her death the victim was alive at 2:05 p.m. and in the tack room of her barn with defendant, between 2:00 and 2:10 p.m. defendant twice refused admission to the tack room to persons who had legitimate business there, the unarmed victim was shot at four times with a .38 caliber pistol and three of the bullets penetrated her vital organs and caused her death, defendant went to a neighbor's house at 2:30 and told the neighbor that the victim had been shot and that she should go to her at once, defendant was then upset and sometimes incoherent, defendant stated that she wanted to kill herself, the neighbor went straight to the tack room and found the victim's body, defendant went to a married couple's nearby home and asked the wife to call defendant's attorney and told the couple that the victim was dead and the police were coming to arrest her, the pistol used in the killing had previously disappeared from the victim's automobile, and the pistol was discovered in a pond between the barn and the nearby house to which defendant first went after the victim had been shot.

**2. Homicide § 18— premeditation and deliberation — circumstances to consider**

Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of defendant before and after the killing; the use of grossly excessive force, or the dealing of lethal blows after the deceased had been felled.

**3. Homicide § 21— sufficiency of evidence of premeditation and deliberation**

In this first degree murder prosecution, premeditation and deliberation were established by evidence that while defendant and the victim were alone in the tack room of a barn shortly before the victim was killed in the tack room, defendant twice refused admission thereto to persons who had legitimate business there, and that the victim, unarmed and helpless to defend herself against an assailant with a deadly weapon, was shot at four times with a .38 caliber pistol and three of the bullets penetrated her vital organs.

**4. Homicide § 17— evidence of motive**

While motive is not an essential element of murder and an accused may be convicted when no motive is proven, evidence of motive is relevant as a circumstance to identify an accused as the perpetrator of an offense.

5. **Evidence § 13— attorney-client privilege**

When the relation of attorney and client exists all confidential communications made by the latter to his attorney on the faith of such relation are privileged and the attorney will not be permitted to disclose them.

6. **Evidence § 13— attorney-client privilege — unlicensed attorney — presence of third person**

In this homicide prosecution, testimony that defendant by telephone asked the witness to come home and stated that the victim was dead and the police were coming to arrest her did not violate the attorney-client privilege where (1) the relationship of attorney and client did not exist because the statements were not made upon the understanding that such relationship existed and because the witness, although having passed the State Bar examination, had not been issued a license to practice, and (2) the statements were not private and confidential because the witness's wife was present during defendant's conversation with the witness.

7. **Criminal Law §§ 73, 169— admission of hearsay — error cured by similar testimony and by cross-examination**

In this homicide prosecution, the trial court erred in the admission of hearsay testimony by a police officer that some three months before her death the victim reported to him the loss or theft from her automobile of the pistol used in the killing; however, such error was cured when testimony of like import was admitted thereafter without objection and when defendant on cross-examination had the officer repeat the same testimony in detail in response to questions propounded for the sole purpose of amplifying the information the officer gave on direct examination and not for the purpose of impeaching his testimony or establishing its incompetency.

APPEAL by defendant from *Hall, J.,* 3 October 1972 Criminal Session of WAKE.

Defendant was tried upon a bill of indictment, couched in the words of G.S. 15-144, which charged her with the murder of Dr. Alice Pugh McInnis on 10 August 1972. Judge Hall charged the jury that it might return a verdict of guilty of murder in the first degree, murder in the second degree, manslaughter, or not guilty. The verdict was "guilty of murder in the first degree." From the judgment that she be imprisoned for the term of her natural life in the State's prison in quarters provided for women prisoners, defendant appeals.

*Attorney General Morgan and Assistant Attorney General Conely for the State.*

*Tharrington, Smith & Hargrove for defendant appellant.*

State v. Van Landingham

SHARP, Justice.

[1]  Defendant's first two assignments of error are that the court erred in denying her motion for nonsuit as to the charge of first degree murder and each of the lesser degrees of homicide included in that charge. Defendant offered no evidence. The State's evidence tended to show:

Dr. McInnis, a Raleigh pediatrician who raised horses, lived on her farm a short distance north of Raleigh. Her residence, directly across Six Forks Road from the Bayleaf Baptist Church, was in a grove about 100 feet from the west side of the road. Since 1965 defendant, Mrs. Van Landingham, had lived on this farm in a house just back of Dr. McInnis'. A driveway from Six Forks Road served both residences and continued past defendant's house for 420 feet to a horse barn and tool shed. After passing between these two buildings the drive became a bridle path leading to and across the dam of a pond southwest of the barn. Beyond the dam it was one of a number of horse trails around the lake and in the wooded area adjacent to it.

During the summer of 1972 Dr. McInnis employed John Simpson (John), a 17-year-old high school boy, to work on the farm. On 10 August 1972 John observed defendant leaving the premises as he came to work at 8:30 a.m. He saw her again about noon as she walked from her house toward the carport. About 10:30 a.m. Dr. McInnis came home, changed into her working clothes, and helped John in the yard until about 12:45 p.m. when she drove to a nearby store to get food for lunch. She returned about 1:00, delivered her purchases to the maid, and walked toward the horse barn.

While waiting for lunch to be prepared John went to the tool shed, procured hand tools, and repaired a broken chain on a trailer. During the performance of this task, which took about five minutes, he observed the Bolda children, Sue, aged 17; Cheryl, aged 11; and Don, aged 15, coming across the dam with a horse. After repairing the chain John returned to the house to wait for Dr. McInnis. She did not return and the maid persuaded him to eat his lunch while it was hot. At two o'clock the maid had gone and Dr. McInnis had still not come for lunch; so John went back to the barn area. He saw the three Bolda children grazing a horse while they ate their lunch on a stump between the barn and the pond. This stump was 87 feet from the barn and 120 feet from the pond. After asking

the children where Dr. McInnis was he went into the barn looking for her. The door of the tack room, which is immediately to the left of the barn entrance, was closed. This door opened to the left inside the room.

John "grabbed hold of the latch," which slips over a U-shaped ring designed for a padlock, and "started opening the door." Before he had moved the door two feet it was stopped from the inside. However, he observed Dr. McInnis sitting on a feed can facing the door. She was wearing sun glasses and had a cigarette in her hand. "She looked casually." There were no weapons in sight. He did not see Mrs. Van Landingham, but he heard her voice from behind the door. She told him "not to come in now, to go back up to the house." A second time she said, "Don't come in now John. We will be up in a minute." The door was then closed. The time was about 2:05 p.m.

The Bolda children had arrived at the McInnis farm about 11:15 a.m. on 10 August 1972 to ride and brush their horse and clean out its stall. They parked their car, which they had to get home by 2:30 p.m., in the churchyard across the road and walked down the drive between the two houses to the barn and the lake. About five minutes after John Simpson had left the barn after inquiring of them as to Dr. McInnis' whereabouts, Cheryl went to the tack room for a brush. As she started to pull the latch back it hit the door. Mrs. Van Landingham then opened the door just enough to stick her head out and said she was busy. Cheryl said, "O. K." and went back to the stump. Ten or fifteen minutes thereafter, at 2:20 p.m., the children left the barnyard by the same route they had come. During their stay at the farm they had heard no shots fired or any other unusual noise.

After John Simpson's conversation with Mrs. Van Landingham at the tack room door he returned to the house to await Dr. McInnis' return. While waiting he fell asleep in the den. At 3:30 p.m. he was awakened by Carol Caniford (Caniford), a neighbor, and Mrs. V. Watson Pugh, Dr. McInnis' sister-in-law. At no time that day had he heard any gun shots fired.

Carol Caniford, an operating room nurse who taught riding at her residence, lived in a house which she rented from defendant. This house, located on the west side of Six Forks Road, is two-tenths of a mile south of the drive leading into the McInnis farm. The distance from the Caniford house to the

McInnis barn is about four-tenths of a mile by way of Six Forks Road and the McInnis drive. It is 679 steps from the McInnis barn to the Caniford house by way of the path across the pond dam and through the woods and pasture—a fast six minutes' walk. The McInnis barn is located straight across the field and woods to the north of the Caniford barn, which is 50-100 feet behind the Caniford house.

The land and barns which Caniford used for her horses were rented from both Dr. McInnis and defendant. Caniford paid low rent because she did a lot of work on the McInnis farm. She had keys to the gates and buildings.

On the morning of 10 August 1972 Caniford, who had been on duty all night at the hospital, got home at 7:30. During the morning she gave riding lessons until noon. Sometime thereafter defendant came to her house to deliver feed which she had purchased that morning at Caniford's request. After the two women unloaded the feed at her barn Caniford returned to the house and went to bed between 1:30 and 2:00 p.m. A pounding on the door awakened her about 2:30 p.m. She went to the door to find defendant standing there, "terribly upset." Defendant said a lot of things "awfully fast"; some were "sort of incoherent" and "a lot of it didn't make any sense." Caniford testified, "A few of the things I know, a few of the things I am not sure about."

Defendant told Caniford that "Alice had been hurt, or Alice had been shot." In answer to Caniford's question whether "she was sure of how badly [Dr. McInnis] was hurt or if she was dead" defendant said she was not sure and that Caniford "must go down there . . . and hurry and just go right now, go." Defendant said either, "I wanted to kill myself," or "I want to kill myself."

Caniford dressed and told defendant she thought she should stay at her (Caniford's) house or go next door and remain with Mrs. John Willardson. As Caniford backed her car out of the driveway defendant was headed across the yard toward the Willardson house.

The Willardsons, who had lived next door to Caniford for two or three weeks, were also defendant's tenants. Mr. Willardson had passed the North Carolina State Bar examination. However, his license had not been issued to him and he had not taken his oath as an attorney. On 10 August 1972 he was

employed as a law clerk by one of the judges of the North Carolina Court of Appeals. On that day, between 2:45 and 3:00 p.m., defendant walked into the Willardson residence without knocking and told Mrs. Willardson that "something is very wrong . . . Dr. McInnis is dead." Mrs. Willardson, who was "really stunned," asked whether she should call the police or an ambulance. Defendant said that Caniford was taking care of that and suggested that she call defendant's attorney, Mr. Al Lloyd. She gave Mrs. Willardson his telephone number from memory. The Willardsons' telephone not having been installed, they went to Caniford's house to make the call.

After trying unsuccessfully to reach Mr. Lloyd, Mrs. Willardson telephoned her husband and said to him, "John, will you please come home and will you please talk to Mrs. Van Landingham, and he did [talk to her over the telephone]." Over defendant's objection Mrs. Willardson testified that she heard defendant's conversation with her husband but she "didn't remember this as clearly because [she] was really nervous." However, she did remember defendant asking her husband "if he could come home because of his job situation" and saying to him, "They are coming to arrest me." John Willardson testified, also over objection, that defendant said to him over the telephone, "John, is there any way you can come home . . . something terrible has happened. Dr. McInnis is dead and the police are coming to arrest me."

Willardson was at home in about 35 minutes after his conversation with defendant. He walked in and told her immediately that he was not in any position to give her legal advice because he was not yet an attorney; that the only thing he could say to her was not to say anything to him or to any other person until she had spoken to an attorney; that since she could not reach Mr. Lloyd he suggested that she call Attorney E. E. Hollowell. Defendant called Hollowell and he came.

When defendant came into the Willardsons' house Mrs. Willardson saw no blood and no signs of injury on her. Deputy Sheriff Covert likewise observed no physical injury to defendant when he saw her at 7:00 p.m. on 10 August 1972.

When Caniford arrived at the McInnis place after having left defendant en route to the Willardson house, she unlocked the front gate, left her car there, and went to the barn. Defendant had not driven her car to Caniford's home and she observed

it in the carport at Dr. McInnis' house. At the barn Caniford found the tack room door padlocked, and unlocked the door with her key. Inside, the dead body of Dr. McInnis was lying on the floor on the right side of the room next to a row of 20-gallon garbage cans used as feed containers. The shoulders and the left hip were flat on the floor; the knees were together and the legs drawn up toward her face, which was turned to the right toward the feed cans. The feet were toward the door. Dr. McInnis' right arm was drawn up across her chest, and there was blood on her fingers. A faded blue towel was lying across her throat. Caniford also noticed a hole all the way through the last feed can which was directly behind her head. She saw no weapon of any description in the tack room.

Caniford tried to telephone from the tack room but all she could get from that telephone was a dial tone. She then ran to defendant's house "because it was the closest" and called Mrs. Pugh. After talking to her and asking her to send an ambulance, Caniford ran back to the barn where the situation remained unchanged. There was no one but her on the premises and, while waiting for the ambulance and the officers to come, she ran back and forth from the barn to the front gate, "hoping [she] was wrong." The ambulance and Mrs. Pugh arrived before the officers. Deputy Sheriff Chalk, who received the word about 2:58 p.m., arrived 12-15 minutes later. Other officers arrived shortly thereafter. Their testimony corroborated in every detail the observations made by Caniford and, in addition, tended to show:

The tack room is 15 feet, 10 inches by 11 feet, 10 inches. Facing the door, along the right wall, were five metal garbage cans on a wooden pallet about an inch off the floor. Beyond the end of the pallet was a plastic garbage can. A bullet which was never recovered had gone through the last can on the pallet and into the wall beyond. A string run from the hole in the wall through the two holes in the garbage can so that it did not touch the sides of the holes, when extended seven feet and one inch from the can, was 51 inches above the floor and behind the door when it was open. Sixteen to eighteen inches from the fifth can from the door were three cigarette butts which had been mashed into the floor. The body of Dr. McInnis, doubled up almost in a sitting position, was on the floor beside the metal cans. Beneath the body was a bullet (State's Exhibit 7). Behind the tack room door a holster (State's Exhibit 6) lay on

State v. Van Landingham

top of a bag "containing a horse brush, a rag, towel." The "screen door handle" on the inside of the door had blood on it. There was also a spot of blood on the outside of the door.

On the evening of 10 August 1972 Dr. Arthur Davis, a pathologist, performed an autopsy on the body of Dr. McInnis. It revealed that her death resulted from bullet wounds which caused massive bleeding into both chest cavities. Three bullets had entered her body. One entered the neck, shattered the clavicle, went through the upper part of the right lung, and out the back by the shoulder blade. Dr. Davis found this bullet (State's Exhibit 5) in her clothing over the exit wound. Another bullet went in the breast, through the right lung and the right side of the heart, through the left lung, fractured ribs, and came out the lower left back. The third bullet went through the abdomen, put a large hole in the hip bone, and lodged in the gluteus maximus. Dr. Davis removed this bullet (State's Exhibit 4). An examination of the vital organs showed Dr. McInnis to have been in perfect health.

Looking for the weapon which fired these bullets, on 10 August the officers searched the area on both sides of the drive from the McInnis barn to Six Forks Road. From there they searched both sides of the highway to Caniford's home. Then they searched the area from the Caniford house back through the pasture and woods by the pond and back to the barn. Extensive searches of the premises, including the pond, continued for eight days. No weapon was found until August 18th when a .38 special Smith & Wesson revolver, model 36, serial number J 30245 (State's Exhibit 11) was recovered from the pond at a point 327 feet from the barn. It was in six feet of water about 10 feet from the edge of the dam and 22 feet from the middle of the road across the dam. In the chamber of the pistol were four empty cartridges and one loaded cartridge.

The revolver (State's Exhibit 11) and the bullets (State's Exhibits 4, 5 and 7) were duly delivered to the State Bureau of Investigation where they were examined by ballistics expert E. B. Pearce. He testified that in his opinion these bullets had been fired in the revolver.

Dr. McInnis had purchased this revolver on 4 September 1970 from the Village Sports Shop. On 6 July 1972 she had purchased another pistol from the same shop.

Raleigh Police Officer E. D. Whitley testified that on 15 May 1972 he had "some police business" with Dr. McInnis and, in consequence, he filed a report with the police department. Over defendant's objection he testified that on that date she had reported a pistol and holster missing from her car. The pistol was a Smith & Wesson, model 36, serial number J 30245. Whitley said, "The weapon was reported lost or stolen. That is what she explained to me. She said it was in her automobile. . . . She said the last time she saw it was in the automobile . . . in a holster; that the items were missing . . . and she wanted to report it to the police department so that there would be a file . . . in case the gun turned up somewhere."

Without objection Dr. McInnis' 19-year-old son, Kirk, testified that he was familiar with the revolver (State's Exhibit 11) which his mother had owned and which she was accustomed to keeping under the front seat of her car, although infrequently she would take it into the house with her at night; that he had shot "a couple hundred rounds out of it"; that at Christmas 1971 he had given his mother a holster for this pistol; that the holster he had given her was the one (State's Exhibit 6) which was found behind the door in the tack room; and that he knew "the pistol became missing, and after that [he] never saw it again until after the death of [his] mother."

Kirk's testimony further tended to show that when defendant came to the farm in 1965 he was enrolled in a preparatory school in Virginia, from which he graduated in May 1971. During a Christmas holiday when he was a freshman or sophomore he had an argument with defendant. In the summer of 1971 he had an argument with her when she said he was making too much noise and scaring the horses and ordered him to stop shooting a rifle into the dam. Another argument occurred during the fall after he had become a student at North Carolina State University. He was talking to his mother in the family room. Defendant came in during the conversation and when he asked her to leave she refused. A heated exchange resulted, and defendant "finally left." After that confrontation Kirk left the farm. He lived with his grandmother until Christmas when he "moved back home because the defendant was not spending as much time out there and [he] felt a little better about being out there." However, in January he left the farm and did not return except for occasional visits which never lasted more than two hours. Defendant and Kirk "just never got along" during the entire time she was living out there, and, when she

would say something to him which his mother did not like, his mother "would ask the defendant to be quiet in a rather firm tone of voice." Kirk and his mother "had a real good relationship." Defendant had one key to the premises which would fit the front gate, the outside doors to Dr. McInnis' house, her house, the tool shed, and the tack room.

Mrs. Pugh, Dr. McInnis' sister-in-law, testified that two or three days prior to 10 August 1972, defendant came to her house and asked her if she knew that Dr. McInnis had asked her to leave the farm. Her reply was, "No." Mrs. Pugh had known defendant since 1965, and their relationship during those years was pleasant.

Defendant's motion for judgment as, of nonsuit raises the question whether the foregoing evidence, taken as true and considered in the light most favorable to the State, is sufficient to permit the jury to make a legitimate inference and finding that the defendant, after premeditation and deliberation, formed a fixed purpose to kill Dr. McInnis and thereafter carried out that purpose. *State v. Perry*, 276 N.C. 339, 346-7, 172 S.E. 2d 541, 547 (1970). The State's evidence, is circumstantial, but the test of the sufficiency of the evidence to withstand a motion for nonsuit is the same whether it be circumstantial, direct, or both. *State v. McKnight*, 279 N.C. 148, 181 S.E. 2d 415 (1971). As Justice Higgins said in *State v. Stephens*, 244 N.C. 380, 383, 93 S.E. 2d 431, 433 (1956):

"We think the correct rule is given in *S. v. Simmons*, 240 N.C. 780, 83 S.E. 2d 904, quoting from *S. v. Johnson*, 199 N.C. 429, 154 S.E. 730: 'If there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.' The above is another way of saying there must be substantial evidence of all material elements of the offense to withstand the motion to dismiss. It is immaterial whether the substantial evidence is circumstantial or direct, or both." *Accord, State v. McKnight, supra; State v. Morgan*, 268 N.C. 214, 150 S.E. 2d 377 (1966).

Defendant argues that the evidence is insufficient to support a finding by the jury either (1) that defendant fired the shots which killed Dr. McInnis; or (2) that, if she did, the killing was done with premeditation and deliberation.

[2]  Ordinarily it is not possible to prove premeditation and deliberation by direct evidence. These facts must be established by proof of circumstances from which they may be inferred. Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of defendant before and after the killing; the use of grossly excessive force, or the dealing of lethal blows after the deceased has been felled. *See State v. Walters* and cases cited, 275 N.C. 615, 623-24, 170 S.E. 2d 484, 490 (1969). *See also State v. Johnson*, 278 N.C. 252, 179 S.E. 2d 429 (1971).

In our view the State's evidence is sufficient to support the following findings:

On the day of her death, at 2:05 p.m., Dr. McInnis was alive and in the tack room of her barn with defendant. Sometime between 2:10 p.m. and 2:30 p.m. defendant, standing behind the tack room door (had it been opened), intentionally shot and killed Dr. McInnis with a .38 Smith & Wesson revolver, model 36, serial number J 30245. This pistol had belonged to Dr. McInnis, but it had been missing for some time. Dr. McInnis, who was unarmed, was not expecting the onslaught. Defendant fired three shots at close range into Dr. McInnis' body. As Dr. McInnis slumped to the floor, or after she was on the floor, defendant fired a fourth shot which missed Dr. McInnis, passed through the last metal feed can, and entered the wall. After the shooting defendant laid a towel across Dr. McInnis' throat, padlocked the tack room door, and walked across the pond dam, through the woods and pasture, to Caniford's house. As she passed over the dam the defendant threw the pistol with which she had shot Dr. McInnis into the pond, from which it was retrieved eight days later. The holster for this pistol was left behind the door of the tack room. It was the one which Kirk McInnis had given his mother the preceding Christmas.

After awakening Caniford by pounding on her door, defendant, "terribly upset" and sometimes incoherent, told the shocked Caniford that Dr. McInnis had been shot and that she should go to her at once. Defendant did not say who had shot Dr. McInnis, but she did say, "I wanted to kill myself" or "I want to kill myself."

As Caniford left for the McInnis barn—where she went straight to the tack room and found Dr. McInnis' body after

State v. Van Landingham

unlocking the door—defendant went next door to the Willardson home. There she requested Mrs. Willardson to call her attorney, Mr. Lloyd. When Mrs. Willardson was unable to reach Mr. Lloyd defendant talked to Mr. Willardson on the telephone. She asked him to come home because "Dr. McInnis is dead and the police are coming to arrest me." She did not tell either Mr. or Mrs. Willardson who had shot Dr. McInnis.

Had defendant not been the killer it is beyond belief that she would have failed to identfiy Dr. McInnis' assassin or to have related the circumstances under which she learned of Dr. McInnis' death to both Caniford and the Willardsons. Since Caniford went directly to the tack room it is a legitimate inference that defendant had told her where the body was. Although she told Caniford she was not sure whether Dr. McInnis was dead, defendant told Mr. and Mrs. Willardson she was dead and the police were coming to arrest her. This latter declaration, together with defendant's request that Mrs. Willardson call defendant's lawyer, clearly manifested defendant's knowledge that she would soon be charged with unlawful homicide.

[3] The following facts are sufficient to establish premeditation and deliberation: (1) Between 2:00 and 2:10 p.m. defendant had twice refused admission to the tack room to persons who had legitimate business there; and (2) Dr. McInnis, unarmed and helpless to defend herself against an assailant with a deadly weapon, was shot at four times with a .38 caliber pistol, and three of the bullets penetrated her vital organs.

[4] Motive is not an essential element of murder, and an accused may be convicted when no motive at all is proven. *State v. King*, 226 N.C. 241, 37 S.E. 2d 684 (1946); Miller, *Criminal Law* § 15 (1934). However, "[e]vidence of motive is relevant as a circumstance to identify an accused as the perpetrator of an offense." *State v. Palmer*, 230 N.C. 205, 213, 52 S.E. 2d 908, 913 (1949). Unless it was defendant's attitude toward Kirk McInnis, the record contains no suggestion why, after seven years, Dr. McInnis had asked defendant to leave the farm. Presumably, however, the reason was an occurrence, or an accumulation of events, which Dr. McInnis regarded as significant. Defendant's violent and tragic conduct tends to prove that presumption.

[1] We hold that the judge properly overruled defendant's motions for nonsuit.

Assignments of error Nos. 3 and 4 raise the question whether the trial judge erred (1) in permitting the witness Ann Willardson to testify as to statements which defendant made during her telephone conversation with John Willardson, and (2) in permitting John Willardson to testify as to the statements which defendant made to him during that call. Defendant contends that her statements to Willardson were privileged communications between attorney and client and that the presence of his wife when the statements were made did not destroy the privilege.

[5] The long-established rule is that when the relation of attorney and client exists all confidential communications made by the latter to his attorney on the faith of such relation are privileged, and the attorney will not be permitted to disclose them. *See Dobias v. White,* 240 N.C. 680, 83 S.E. 2d 785 (1954) ; *State v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686 (1947) ; *Guy v. Bank,* 206 N.C. 322, 173 S.E. 600 (1934) ; *Carey v. Carey,* 108 N.C. 267, 12 S.E. 1038 (1891) ; *Hughes v. Boone,* 102 N.C. 137, 9 S.E. 286 (1889) ; *Setzar v. Wilson,* 26 N.C. 501 (1844). For an elaboration of the rule see 1 Stansbury, *North Carolina Evidence* § 62 (Brandis rev. 1973). This rule prevented neither John Willardson nor his wife from disclosing defendant's telephone conversation with Willardson.

[6] First, the relationship of attorney and client did not exist between defendant and Willardson at the time of the conversation; nor could such a relationship have been established since he was not then an attorney. *State v. Smith,* 138 N.C. 700, 50 S.E. 859 (1905). "The rule extends only to such confidential communications as are made to the attorney by virtue of his *professional* relation to the client." It has no application to an adviser who "had no legal right to appear as prisoner's attorney in any court in this State. . . . " *Id.* at 703, 50 S.E. at 860. Defendant's spontaneous exclamation to Willardson, "John can you come home . . . something terrible has happened. Dr. McInnis is dead and the police are coming to arrest me." was clearly not made upon the understanding that the relation of attorney and client had been established between them. There had been no time for that. Indeed the evidence is devoid of any suggestion that defendant thought Willardson was a licensed attorney. Since she was a lieutenant colonel in the Army Reserve unit in which he was a staff sergeant, as his landlord, neighbor and friend she doubtlessly knew he was not yet an attorney. The

implication is that, at Mrs. Willardson's instance, defendant was talking to Willardson as a friend and neighbor. Certainly that was the capacity in which he came home to advise defendant to make no statements to him or any other person until she was able to consult with a duly licensed attorney.

Second, had Willardson been an attorney the challenged communication was not private and confidential as between him and defendant. One of the requisites of the attorney-client privilege is that the communication must have been made in confidence. *Michael v. Foil*, 100 N.C. 178, 6 S.E. 264 (1888). "Communications between attorney and client are not privileged where made in the presence of a third person, not the agent of either party. . . . " 97 C.J.S. *Witnesses* § 290 (1957). *See also* McCormick, *Evidence* § 91 (Cleary Ed., 2d ed. 1972). Mrs. Willardson was present during defendant's entire conversation with her husband. She was an outsider with respect to the subject of defendant's disclosure and her presence was not essential to the transmission of the communication.

Since Willardson was a competent witness, *a fortiori*, Mrs. Willardson was a competent witness to relate the challenged conversation to the jury. "A member of an attorney's family who is present during communications between the attorney and a client is not by reason of the attorney-client privilege an incompetent witness to testify to such communications." Annot., 96 A.L.R. 2d 125, 132 (1964). *Compare State v. McKinney*, 175 N.C. 784, 95 S.E. 162 (1918).

We hold that assignments Nos. 3 and 4 are without merit.

Defendant did not bring forward her assignments of error Nos. 5 and 6. They are therefore deemed abandoned. 1 Strong, N. C. Index 2d *Appeal and Error* § 45 (1967).

[7] Assignment of error No. 7 relates to the admission of Police Officer Whitley's testimony that on 15 May 1972 Dr. McInnis reported to him the loss or theft from her automobile of a Smith & Wesson pistol, model 36, serial number J 30245, and that he "filed a report in the Raleigh Police Department." Defendant asserts that this testimony was incompetent hearsay and that "the prejudicial effect of this evidence is clear" because it suggests defendant stole Dr. McInnis' pistol approximately three months before it was used to slay her. The State's argument is, "Whitley was merely testifying from an official record of a transaction which he personally had with the decedent, a

copy of which he was authorized to keep" and that "testimony based upon such record was admissible in evidence."

Dr. McInnis' statement to the officer was clearly hearsay which falls within no exception to the rule excluding hearsay evidence. *See State v. Oakes*, 249 N.C. 282, 106 S.E. 2d 206 (1958) ; *Gurganus v. Trust Co.*, 246 N.C. 655, 100 S.E. 2d 81 (1957) ; *United States v. Graham*, 391 F. 2d 439 (6th Cir.), *cert. denied*, 393 U.S. 941 (1968). Since the State did not offer in evidence the report which Whitley filed, any discussion of police reports as entries màde in the course of business is neither necessary nor appropriate. *See*, however, *United States v. Burruss*, 418 F. 2d 677 (4th Cir. 1969) ; *United States v. Shiver*, 414 F. 2d 461 (5th Cir. 1969) ; McCormick, *Evidence* § 310, at 725-26 (Cleary Ed., 2d ed. 1972) ; Baker, *Admissibility of Investigational Reports Under Business Records Statutes*, 33 Albany L. Rev. 251 (1969).

The admission of Officer Whitley's testimony was error, but the error was cured when testimony of like import was admitted thereafter without objection. The well established rule in this State is that "when incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost, but, as stated . . . in *Shelton v. R. R.*, . . . 'The rule does not mean that the adverse party may not, on cross-examination, explain the evidence, or destroy its probative value, or even contradict it with other evidence, upon peril of losing the benefit of his exception.' " *State v. Godwin*, 224 N.C. 846, 847-8, 32 S.E. 2d 609, 610 (1945). *See also State v. Stepney*, 280 N.C. 306, 185 S.E. 2d 844 (1972) ; *State v. Williams*, 274 N.C. 328, 163 S.E. 2d 353 (1968) ; *State v. Brown*, 272 N.C. 512, 158 S.E. 2d 354 (1968) ; 1 Stansbury, *N. C. Evidence* § 30 (Brandis rev. 1973) ; 1 Strong, N. C. Index 2d *Appeal and Error* § 48, at 196-7 (1967).

Kirk McInnis testified without objection that he was aware that the pistol (State's Exhibit 11) "became missing" and that he never saw it thereafter until after his mother's death. Dr. McInnis' purchase of a similar gun on 6 July 1972 tends to corroborate this testimony. The crux of Whitley's testimony was that the pistol was missing, not that Dr. McInnis had reported its disappearance. Further, on cross-examination, defendant had Whitley repeat, in clarifying detail, the same

testimony to which objection had been made on direct examination. The evidence before us is in narrative form. It seems clear, however, that the cross-examiner's questions were general ones, propounded for the sole purpose of amplifying the information Whitley had given on direct examination and not for the purpose of impeaching his testimony or establishing its incompetency. We think the cross-examination exceeded the bounds of the rule stated in *Shelton v. R. R.*, 193 N.C. 670, 139 S.E. 232 (1927). *See also State v. Tew*, 234 N.C. 612, 68 S.E. 2d 291 (1951) ; *Cf. State v. Aldridge*, 254 N.C. 297, 118 S.E. 2d 766 (1961).

We hold that the admission of Whitley's testimony to which objection was erroneously overruled on his direct examination was not prejudicial error. *See* 3 Strong, N. C. Index 2d *Criminal Law* § 169. (1967). Assignment of error No. 8 is formal and requires no discussion. In defendant's trial we find

No error.