IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-748

Filed 18 June 2025

Wake County, Nos. 19CRS216598-910, 19CRS216599-910

STATE OF NORTH CAROLINA

v.

TYSHON GEROD SOLOMON

Appeal by defendant from judgments entered 2 June 2023 by Judge Keith O. Gregory in Wake County Superior Court. Heard in the Court of Appeals 25 February 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General John H. Schaeffer, for the State.*

*William D. Spence for defendant.*

FREEMAN, Judge.

Defendant appeals from judgments entered upon a jury verdict finding him guilty of two counts of first-degree murder. Defendant argues the trial court erred by: (1) denying his motion to dismiss; (2) admitting evidence of his commission of a drive-by shooting in 2017; and (3) failing to intervene *ex mero motu* during the State's closing argument. After careful review, we conclude defendant received a fair trial free of prejudicial error.

## I. Factual and Procedural Background

On 4 September 2019, Vincent Arocho and Jaquan Dumas were sitting in Mr. Arocho's parked car when they were murdered in a drive-by shooting in Raleigh. Mr. Arocho, who suffered nine gunshot wounds—including six gunshot wounds to the head—was found in the driver's seat with his seatbelt still on. Mr. Dumas, who suffered seven gunshot wounds, was found lying on the street beside the vehicle's open passenger door. Witnesses at a nearby daycare center heard the shots, saw a white car driving away from the scene, and called 911.

As part of its investigation into the murders, the Raleigh Police Department collected video surveillance footage from several nearby businesses. These businesses included a Taco Bell, a McDonald's, a non-profit center, a Food Lion, and the daycare center. Footage from the nearby McDonald's showed a white vehicle driving from the McDonald's parking lot to the Food Lion parking lot at 12:06 p.m., about an hour before the murders occurred. Then, at 12:08 p.m., footage from the Taco Bell showed the white vehicle park outside the restaurant. The footage captured three occupants exit the vehicle, interact with a fourth individual in the parking lot, and then enter the restaurant with the fourth individual. Based on this footage and interior surveillance footage from the Taco Bell, police identified these individuals as Jesse Dontez Fraizer, Jonathan Isaiah Manning, Bert Thomas Lucas, Jr., and defendant. Both Mr. Frazier and defendant were known to police as members of the Bloods gang.

The surveillance footage showed defendant place his phone to his ear at 12:15

p.m., and defendant's cell phone records later revealed that defendant received a call from Mr. Arocho at this time. The individuals re-entered the white vehicle at 12:26 p.m. and left the Taco Bell parking lot. Surveillance footage showed that defendant was not driving the vehicle.

At 1:16 p.m., Mr. Arocho's vehicle arrived at the daycare center. About a minute later, the white suspect vehicle arrived with its passenger side pulling up to the driver's side of Mr. Arocho's vehicle. A burst of gunfire erupted from the white vehicle into Mr. Arocho's vehicle, at which point Mr. Dumas exited Mr. Arocho's vehicle to escape. The white vehicle then pulled in front of Mr. Arocho's vehicle, unleashed a second volley of gunfire towards Mr. Dumas, and left the scene. Footage from the McDonald's showed the same white vehicle "going outbound" away from the murder scene at 1:20 p.m. Police later located and stopped the white suspect vehicle and took its driver, Mr. Manning, into custody.

A few days after the murders, Mr. Lucas voluntarily spoke to police about his interaction with the other three suspects. According to Mr. Lucas, he approached the suspects in the Taco Bell parking lot and asked for a ride to a nearby friend's house. The suspects agreed, drove Mr. Lucas to his destination, and then drove away. Mr. Lucas' friend was not at the destination so he decided to leave and walk back the way he came. As nearby surveillance footage corroborated Mr. Lucas' story and showed him walking down the street near the time of the murders, the police excluded Mr. Lucas as a suspect.

Raleigh police obtained and executed a search warrant on defendant's residence, where they found ammunition of the same caliber used to inflict some of the wounds on Mr. Arocho. Defendant's ankle monitor, a condition of his release from prison on a prior conviction stemming from a separate drive-by shooting, showed he was outside his home on the day of the shooting from 11:05 a.m. to 12:40 p.m. and from 12:44 p.m. to 1:37 p.m.

Cell phone analysis of defendant's cell phone revealed that the phone was new and had been activated less than four hours after the murders. However, because defendant used this new phone to log into his existing accounts, it contained all of defendant's old phone data. This data revealed that defendant contacted an individual regarding a drug sale and told the individual that defendant would be in a white car. Analysis of defendant's phone and Mr. Arocho's phone showed the two had been in contact in the days leading up to the shooting and that the last four calls made by Mr. Arocho were to defendant. Cell phone analysis also placed defendant's phone "within a block or two" of the crime scene at the time of the shooting.

Less than four hours after the shooting, defendant used his newly activated phone to message a contact saved as "Wifeyyy," writing "My new number, Bae." "Wifeyyy" messaged defendant: "Oh, Bae. That shit all over the news. You never told me why." Defendant responded: "You know we can't talk on phones, Baby." Within the first 48 hours after the shooting, defendant exchanged 39 calls with suspects Mr. Frazier and Mr. Manning. Defendant also searched WRAL.com for stories about the

shootings, visited Mr. Arocho's Facebook page, viewed numerous images of Mr. Arocho, and searched the Wake County Court Calendar for cases involving his own name.

Two days after the murders, Raleigh police spoke with defendant's probation and parole officer, John Kidd, and informed him that a warrant for defendant's arrest had been issued. After this discussion, defendant showed up unannounced and unscheduled at Officer Kidd's office. Defendant was subsequently arrested, and on 23 September 2019, defendant was indicted on one count of first-degree murder for the death of Mr. Dumas and one count of first-degree murder for the death of Mr. Arocho.

Defendant's matter came on for trial on 22 May 2023 in Wake County Superior Court. At trial, under Rule 404(b) and over defendant's objection, the State introduced evidence of defendant's involvement in a 2017 drive-by shooting for the purpose of proving defendant's identity. Defendant had pleaded guilty to a charge of assault with a deadly weapon with intent to kill stemming from that incident and had been released from prison one month prior to the murders of Mr. Arocho and Mr. Dumas. In closing arguments, the State referenced this incident and told the jury that defendant "likes to shoot out of the backs of cars at people, like he did" in the 2017 incident. Defendant did not object to the State's closing remarks.

At the conclusion of trial, and after the trial court denied defendant's motion to dismiss, the jury convicted defendant of both charges of first-degree murder under

three different theories: premeditation and deliberation, lying in wait, and felony murder. The trial court sentenced defendant to consecutive terms of life imprisonment without parole. Defendant gave oral notice of appeal at the sentencing hearing and now argues the trial court erred in: (1) denying his motion to dismiss the first-degree murder charges; (2) admitting evidence of the 2017 shooting; and (3) failing to intervene *ex mero motu* during the State's closing argument.

## II.     Jurisdiction

This Court has jurisdiction to consider defendant's appeal of right from the Wake County Superior Court's final judgment. *See* N.C.G.S. § 7A-27(b)(1) (2023); *see also id.* § 15A-1444(a) (2023).

## III.     Standard of Review

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62 (2007) (citing *State v. McKinnon*, 306 N.C. 288, 298 (1982)). Similarly, "whether Rule 404(b) evidence is properly admitted is a question of law and is reviewed de novo on appeal." *State v. Pickens*, 385 N.C. 351, 355 (2023) (citing *State v. Beckelheimer*, 366 N.C. 127, 130 (2012)). "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Jones*, 355 N.C. 117, 133 (2002) (citing *State v. Trull*, 349 N.C. 428, 451 (1998), *cert. denied*, 528 U.S. 835 (1999)).

## IV.    Discussion

Defendant raises three arguments on appeal.  First, defendant contends the trial court erred in denying his motion to dismiss the first-degree murder charges.  Second, defendant argues the trial court erred by admitting evidence of defendant's involvement in the 2017 drive-by shooting under Rule 404(b).  Finally, defendant contends the trial court erred in failing to intervene *ex mero motu* during the State's closing arguments.  We address each argument in turn.

### A.  Defendant's Motion to Dismiss

Defendant first argues the trial court erred in denying his motion to dismiss the charges of first-degree murder because "the State failed to present substantial evidence that defendant shot either Mr. Dumas or Mr. Arocho or had any part in the shootings."  Specifically, defendant contends that because the State presented only circumstantial evidence "of defendant's identity as the perpetrator" or that defendant "was even present in the shooter's car," and because the State "presented no evidence that [d]efendant had . . . the opportunity to commit the crimes," the State's evidence raised only suspicion and conjecture as to defendant's guilt.[1]  We disagree.

"Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged . . .

---

[1] Defendant also argues the trial court erred in denying his motion to dismiss because the State failed to present substantial evidence of defendant's motive.  This argument is without merit as our Supreme Court has held that "proof of motive is not necessary to sustain a conviction for murder." *State v. Stone*, 323 N.C. 447, 453 (1988) (citing *State v. Landingham*, 283 N.C. 589, 600 (1973)).

and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Powell*, 299 N.C. 95, 98 (1980) (citations omitted). "Substantial evidence only requires more than scintilla of evidence, or the amount necessary to persuade a rational juror to accept a conclusion." *State v. Dover*, 381 N.C. 535, 547 (2022) (cleaned up).

> In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. Moreover, any contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered. Courts considering a motion to dismiss for insufficiency of the evidence should not be concerned with the weight of the evidence.
>
> The test of the sufficiency of the evidence to withstand the motion to dismiss is the same whether the evidence is direct, circumstantial, or both. Circumstantial evidence is proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant. There is no logical reason why an inference which naturally arises from a fact proven by circumstantial evidence may not be made. Therefore, it is appropriate for a jury to make inferences on inferences when determining whether the facts constitute the elements of the crime. Thus, circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.

*Id.* (cleaned up).

Here, defendant relies on *State v. Stallings*, 77 N.C. App. 189 (1985), *disc. rev. denied*, 315 N.C. 596 (1986); *State v. Chavis*, 270 N.C. 306 (1967); *State v. Jones*, 280

N.C. 60 (1971); and *State v. Heaton*, 39 N.C. App. 233 (1978), to support his contention that the State failed to present substantial evidence of his identity as the perpetrator. Upon our review of these cases—decided between forty and fifty-nine years ago—we agree with the State that these cases "are distinguishable as none of them have the technological evidence present in this case." None of these cases involved evidence similar to the key circumstantial evidence presented by the State here, such as video surveillance, cell phone analysis, ankle monitoring data, or internet search history.

The evidence in this case, taken in the light most favorable to the State, tends to show that: (1) prior to the shootings, defendant set up a drug meet with an individual and informed that individual he would be in a vehicle similar to the suspect vehicle; (2) defendant was in contact with one of the victims directly before the shootings; (3) the last calls made by this victim were placed to defendant; (4) defendant left his home about thirty minutes before the shootings and returned about twenty minutes after the shootings; (5) defendant was a passenger in the suspect vehicle shortly before the shootings; (6) defendant's cell phone was within one or two blocks of the crime scene at the time of the shootings; (7) defendant had access to the same type of ammunition used in the shootings; (8) defendant activated a new cell phone mere hours after the shootings; (9) defendant exchanged incriminating messages with a contact mere hours after the shootings; (10) defendant exchanged nearly forty phone calls with other suspects within 48 hours of the shootings; (11) defendant conducted incriminating internet searches, including a search for his own

name on the Wake County Court Calendar, shortly after the shootings; and (12) defendant made a surprise visit to his probation and parole officer two days after the shootings.

Although we agree with defendant that "[w]hether there is sufficient evidence to go to the jury is often a difficult and troublesome question in a criminal case," the question in this case is neither difficult nor troublesome. The State's evidence here, taken together, raises far more than mere suspicion or conjecture as to defendant's identity as one of the perpetrators of this crime and was sufficient "to persuade a rational juror to accept [that] conclusion." *Dover*, 381 N.C. at 547 (cleaned up). Accordingly, the trial court did not err in denying defendant's motion to dismiss.

## B. Evidence of the 2017 Shooting

Defendant next argues the trial court erred in admitting evidence of his involvement in a 2017 drive-by shooting under Rule 404(b). Specifically, defendant contends the trial court's admission of this evidence for the purpose of proving defendant's identity constituted prejudicial error because the 2017 incident was not sufficiently similar to the shootings of Mr. Arocho and Mr. Dumas. We disagree.

Rule 404(b) of our Rules of Evidence provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2023).

"Generally, Rule 404 acts as a gatekeeper against 'character evidence': evidence of a defendant's character . . . admitted 'for the purpose of proving that he acted in conformity therewith on a particular occasion.' " *State v. Pabon*, 380 N.C. 241, 258 (2022) (quoting N.C.G.S. § 8C-1, Rule 404(a)). Evidence proffered under Rule 404(b) "should be carefully scrutinized in order to adequately safeguard against the improper introduction of character evidence against the accused." *State v. Al-Bayyinah*, 356 N.C. 150, 154 (2002).

However, because "Rule 404(b) states a clear general rule of *inclusion*," *Pabon*, 380 N.C. at 258 (cleaned up), character evidence is inadmissible *only* if its sole probative value "is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged," *State v. Coffey*, 326 N.C. 268, 279 (1990). If the proffered evidence is "relevant to any fact or issue other than the defendant's propensity to commit the crime," *State v. Beckelheimer*, 366 N.C. 127, 130 (2012) (cleaned up), including but not limited to the purposes described in Rule 404(b), the evidence is admissible. To determine whether character evidence is admissible under Rule 404(b), our Courts rely on "the useful guidance of twin north stars: similarity and temporal proximity." *Pabon*, 380 N.C. at 259. As defendant does not contend the evidence here was too remote in time to the charged offenses, our analysis focuses on similarity.

"[P]rior bad acts are considered sufficiently similar under Rule 404(b) if there

are some unusual facts present in both crimes that would indicate that the same person committed them." *Id.* (cleaned up). However, "[w]hen the State's efforts to show similarities between crimes establish no more than characteristics inherent to most crimes of that type, the State has failed to show that sufficient similarities existed for the purposes of Rule 404(b)." *State v. Carpenter*, 361 N.C. 382, 390 (2007) (cleaned up).

If an appellate court "determines in accordance with these guiding principles that the admission of the Rule 404(b) testimony was erroneous, it must then determine whether that error was prejudicial" by applying the prejudicial error test set forth in subsection 15A-1443(a) of our General Statutes. *Pabon*, 380 N.C. at 260. Under this subsection, the defendant bears the burden of demonstrating "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2023).

Here, the State sought to introduce evidence regarding defendant's involvement in a drive-by shooting that occurred in April 2017 for the purpose of establishing defendant's identity as the perpetrator of the charged offenses. In the 2017 incident, defendant, who was sitting in the back passenger seat of a white car, fired two or three shots at another vehicle carrying Taisha Ferrell and two other individuals. Defendant filed a motion to exclude evidence of this incident, and the trial court held a hearing on defendant's motion prior to trial.

At the hearing, the State argued there was sufficient evidence that defendant committed the prior act because defendant "plead guilty . . . to assault with a deadly weapon [with] intent to kill for which he was convicted and sent to prison for." The State contended the 2017 incident was substantially similar to the shootings of Mr. Arocho and Mr. Dumas because both incidents involved: (1) "car-to-car combat"; (2) "shooting . . . from one car into another car"; (3) defendant in a vehicle with two other individuals; (4) "semiautomatic handguns"; (5) a shooting in a public place in southeast Raleigh; and (6) a white car. The trial court agreed the incidents were "similar in nature," determined the evidence was not unduly prejudicial under Rule 403, and allowed the evidence to be admitted with a limiting jury instruction that it be considered for identity purposes only.

On appeal, defendant argues the trial court erred in admitting this evidence because the two acts were not sufficiently similar and the evidence therefore served no proper purpose "other than to show defendant's propensity or disposition to commit an offense like the one he was on trial for." Defendant essentially contends that because the similarities between the two drive-by shootings "establish no more than characteristics inherent to most crimes of that type, the State has failed to show that sufficient similarities existed for the purposes of Rule 404(b)." *Carpenter*, 361 N.C. at 390 (cleaned up).

This case raises an interesting question: when reviewing whether similarities are merely "characteristics inherent to most *crimes of that type*," *id.* (emphasis

added), should an appellate court construe "crimes of that type" as a broad or narrow category? For example, whether sufficient similarities exist between the two events in this case may turn on whether both crimes are categorized broadly as assaults with a deadly weapon or narrowly as drive-by shootings. Defendant appears to prefer this Court employ a narrow construction and argues the "details of the 2017 shooting were generic to the act of shooting into an occupied vehicle." The State appears to prefer a broader construction and contends the "2017 shooting . . . was sufficiently similar to the 2019 shootings[.]"

However, because defendant bears the burden of demonstrating both error *and* prejudice, we need not answer this question in the instant case. *See Pabon*, 380 N.C. at 260 (foregoing error analysis and resolving the defendant's 404(b) argument on prejudice grounds). Even if we presume, without deciding, that the trial court erred in admitting evidence of defendant's commission of the 2017 drive-by shooting, we are convinced that any such error was harmless. The State's other evidence in this case—discussed in detail above—was overwhelming despite its circumstantial nature, and defendant cannot demonstrate a reasonable possibility that he would have been acquitted absent the admission of the State's 404(b) evidence. Accordingly, the trial court did not prejudicially err in admitting evidence of the 2017 shooting.

## C. The State's Closing Remarks

Finally, defendant argues the trial court reversibly erred in failing to intervene *ex mero motu* during the State's closing argument. Specifically, defendant contends

the State's comment that defendant "likes to shoot out of the back of cars at people, like he did Ms. Ferrell and her sister" was extreme and grossly improper. We disagree.

When, as here, a defendant fails to object to "comments made by the prosecutor during closing arguments, only an extreme impropriety will compel this Court to hold that the trial judge abused his [or her] discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Parker*, 377 N.C. 466, 471 (2021) (cleaned up).

> The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Id.* (quoting *State v. Jones*, 355 N.C. 117, 133 (2002)).

"A trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial." *Id.* at 472 (cleaned up). Thus, an argument is only "grossly improper" if it constitutes "conduct so extreme that it renders a trial fundamentally unfair and

- 15 -

denies the defendant due process." *Id.* (quoting *State v. Fair*, 354 N.C. 131, 153 (2001)).

"To meet the gross-impropriety standard, a prosecutor's remarks must be both improper and prejudicial." *State v. Copley*, 386 N.C. 111, 117 (2024) (cleaned up).

> A statement is improper if calculated to lead the jury astray. That is because the lawyer's function during closing argument is to provide the jury with a summation of the evidence, which in turn serves to sharpen and clarify the issues for resolution by the trier of fact. Closing remarks must thus be limited to relevant legal issues, and counsel may not place before the jury incompetent and prejudicial matters. For that reason, incorrect statements of law in closing arguments are improper. And arguments stray beyond permissible bounds when lawyers become abusive, inject their personal experiences, express their personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record.
>
> The prejudice prong looks to whether a prosecutor's remarks were so overreaching as to shift the focus of the jury from its fact-finding function to relying on its own personal prejudices or passions. Put differently, the closing comments must have veered far enough into improper terrain to impede the defendant's right to a fair trial. To examine prejudice, we assess the likely impact of any improper argument in the context of the entire closing. Rather than atomizing statements and wrenching them from their surroundings, we consult the setting in which the remarks were made and the overall factual circumstances to which they referred.

*Id.* at 117–18 (cleaned up).

Here, "[r]ather than atomizing" the statement defendant challenges "and wrenching [it] from [its] surroundings," *id.* at 118, we must consider the allegedly

improper argument in context.  The State's full closing argument regarding the 2017

incident, with the challenged statement italicized, was:

> You will also hear about prior bad acts and you'll be
> instructed with two limitations. One is going to be about
> April of 2017 that the defendant discharged a firearm at a
> vehicle. The evidence was received solely for the purpose of
> showing identity of the person that committed the crime
> charged in that case. We'll go to this part in a second, but
> first let's focus on the 2017 part. You can only consider it
> for identity. It's a limited purpose. And the law is designed
> that way. But what about 2017 that you heard goes
> towards identity? The identity of Mr. Solomon being the
> perpetrator of this double homicide. Because you heard
> that from testimony elicited by Mr. Cheston as he asked
> detective—yes, now Detective Kuchen about the distance
> between the area of Community Drive over to Solar
> Drive—and you heard a lot about Solar Drive, questions
> about that—was .66 miles. It's not within a block and a
> half. It's outside the range of those cell towers, but it's .66
> miles. It's in Mr. Solomon's neighborhood. It's in the area
> that he fled to after he shot at Taisha Ferrell.
>
> He knows the neighborhood. He knows where to put people
> into place after he has them on the phone. He knows how
> to navigate the area. *And he likes to shoot out of the backs
> of cars at people, like he did Ms. Ferrell and her sister*. It
> goes to his identity and that's the only purpose you can use
> it for, to be clear, but the similarities are uncanny.

Even if we presume such statement improperly expressed the prosecutor's

opinion, we cannot say this statement "veered far enough into improper terrain to

impede the defendant's right to a fair trial." *Copley*, 386 N.C. at 118.  Properly viewed

in the context of the prosecutor's repeated cautions and reminders that the 2017

evidence was to be considered solely for the purpose of identity, this statement was

not "so overreaching as to shift the focus of the jury from its fact-finding function to relying on its own personal prejudices or passions." *Id*. Accordingly, we conclude this statement was not grossly improper and the trial court did not err in failing to intervene *ex mero motu*.

## V.    Conclusion

The State's extensive technological evidence—including surveillance, cell phone analysis, and monitoring of defendant's ankle monitor—tended to show defendant's identity as one of the perpetrators of this double murder and was therefore sufficient to survive defendant's motion to dismiss. Due to this extensive evidence, any error in admitting 404(b) evidence of defendant's commission of a drive-by shooting in 2017 was harmless. Finally, the State's reference to the 2017 incident during closing arguments was not so grossly improper as to require the trial court to intervene *ex mero motu*. Defendant received a fair trial, free of prejudicial error.

NO PREJUDICIAL ERROR.

Chief Judge DILLON and Judge HAMPSON concur.