MARGARET DICKSON, ALICIA CHISOLM, ETHEL CLARK, MATTHEW A. McLEAN, MELISSA LEE ROLLIZO, C. DAVID GANTT, VALERIA TRUITT, ALICE GRAHAM UNDERHILL, ARMIN JANCIS, REBECCA JUDGE, ZETTIE WILLIAMS, TRACEY BURNS-VANN, LAWRENCE CAMPBELL, ROBINSON O. EVERETT, JR., LINDA GARROU, HAYES McNEILL, JIM SHAW, SIDNEY E. DUNSTON, ALMA ADAMS, R. STEVE BOWDEN, JASON EDWARD COLEY, KARL BERTRAND FIELDS, PAMLYN STUBBS, DON VAUGHAN, BOB ETHERIDGE, GEORGE GRAHAM, JR., THOMAS M. CHUMLEY, AISHA DEW, GENEAL GREGORY, VILMA LEAKE, RODNEY W. MOORE, BRENDA MARTIN STEVENSON, JANE WHITLEY, I.T. ("TIM") VALENTINE, LOIS WATKINS, RICHARD JOYNER, MELVIN C. McLAWHORN, RANDALL S. JONES, BOBBY CHARLES TOWNSEND, ALBERT KIRBY, TERRENCE WILLIAMS, NORMAN C. CAMP, MARY F. POOLE, STEPHEN T. SMITH, PHILIP A. BADDOUR, and DOUGLAS A. WILSON  v. ROBERT RUCHO, in his official capacity only as the Chairman of the North Carolina Senate Redistricting Committee; DAVID LEWIS, in his official capacity only as the Chairman of the North Carolina House of Representatives Redistricting Committee; NELSON DOLLAR, in his official capacity only as the Co-Chairman of the North Carolina House of Representatives Redistricting Committee; JERRY DOCKHAM, in his official capacity only as the Co-Chairman of the North Carolina House of Representatives Redistricting Committee; PHILIP E. BERGER, in his official capacity only as the President Pro Tempore of the North Carolina Senate; THOM TILLIS, in his official capacity only as the Speaker of the North Carolina House of Representatives; THE STATE BOARD OF ELECTIONS; and THE STATE OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE OF BRANCHES OF THE NAACP, LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, DEMOCRACY NORTH CAROLINA, NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE, REVA McNAIR, MATTHEW DAVIS, TRESSIE STANTON, ANNE WILSON, SHARON HIGHTOWER, KAY BRANDON, GOLDIE WELLS, GRAY NEWMAN, YVONNE STAFFORD, ROBERT DAWKINS, SARA STOHLER, HUGH STOHLER, OCTAVIA RAINEY, CHARLES HODGE, MARSHALL HARDY, MARTHA GARDENHIGHT, BEN TAYLOR, KEITH RIVERS, ROMALLUS O. MURPHY, CARL WHITE, ROSA BRODIE, HERMAN LEWIS, CLARENCE ALBERT, JR., EVESTER BAILEY, ALBERT BROWN, BENJAMIN LANIER, GILBERT VAUGHN, AVIE LESTER, THEODORE MUCHITENI, WILLIAM HOBBS, JIMMIE RAY HAWKINS, HORACE P. BULLOCK, ROBERTA WADDLE, CHRISTINA DAVIS-McCOY, JAMES OLIVER WILLIAMS, MARGARET SPEED, LARRY LAVERNE BROOKS, CAROLYN S. ALLEN, WALTER ROGERS, SR., SHAWN MEACHEM, MARY GREEN BONAPARTE, SAMUEL LOVE, COURTNEY PATTERSON, WILLIE O. SINCLAIR, CARDES HENRY BROWN, JR., and JANE STEPHENS v. THE STATE OF NORTH CAROLINA; THE NORTH CAROLINA STATE BOARD OF ELECTIONS;  THOM TILLIS, in his official capacity as Speaker of the North Carolina House of Representatives; and PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate

No. 201PA12

(Filed 25 January 2013)

**Evidence — attorney-client privilege — redistricting — no waiver by statute**

Section 120-133 of the North Carolina General Statutes does not waive the right of legislators to assert the attorney-client privilege or work-product doctrine in litigation concerning redistricting where the statute is silent on the issue. Any waiver of such well-established legal principles must be clear and unambiguous and this statute in no way mentions, let alone explicitly waives, the attorney-client privilege or work-product doctrine. The phrase "notwithstanding any other provision of law" in the statute lacks a contextual definition; the ordinary meaning of "provision," determined by reference to a *Black's Law Dictionary*, refers to a statue.

Justice BEASLEY did not participate in the consideration or decision of this case.

Justice HUDSON dissenting.

Appeal pursuant to N.C.G.S. § 120-2.5 from an order entered on 20 April 2012 by a three-judge panel of the Superior Court, Wake County appointed by the Chief Justice pursuant to N.C.G.S. § 1-267.1, allowing plaintiffs' motion to compel production of certain documents. On 11 May 2012, the Supreme Court of North Carolina issued an order expediting hearing of the appeal. Heard in the Supreme Court on 10 July 2012.

*Poyner Spruill LLP, by Edwin M. Speas, Jr., for Dickson plaintiff-appellees; and Edwin M. Speas, Jr., Southern Coalition for Social Justice by Anita S. Earls, and Ferguson Stein Chambers Gresham & Sumter, P.A. by Adam Stein, for NC NAACP plaintiff-appellees.*

*Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Thomas A. Farr and Phillip J. Strach, for legislative defendant-appellants; and Roy Cooper, Attorney General, by Alexander McC. Peters and Susan K. Nichols, Special Deputy Attorneys General, for all defendant-appellants.*

*Bussian Law Firm, PLLC, by John A. Bussian, for North Carolina Press Association, Inc.; and Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Mark J. Prak, for North Carolina Association of Broadcasters, Inc., amici curiae.*

*Stevens Martin Vaughn & Tadych, PLLC, by Hugh Stevens, for The North Carolina Open Government Coalition, Inc., amicus curiae.*

JACKSON, Justice.

In this appeal we consider whether section 120-133 of the North Carolina General Statutes waives the right of legislators to assert the attorney-client privilege or work-product doctrine in litigation concerning redistricting. Because any waiver of such well-established legal principles must be clear and unambiguous, we conclude that the statute's silence on such waivers renders the statute ambiguous as to this issue. After further analysis, we conclude that the General Assembly did not intend to waive either the attorney-client privilege or work-product doctrine when it enacted section 120-133. While we acknowledge that the General Assembly may choose to waive its legal rights, we are unwilling to infer such a sweeping waiver unless the General Assembly leaves no doubt about its intentions. Accordingly, we affirm in part and reverse in part the order of the three-judge panel for the reasons stated below.

On 27 and 28 July 2011, the North Carolina General Assembly enacted new redistricting plans for the North Carolina House of Representatives, North Carolina Senate, and United States House of Representatives pursuant to Article II, Sections 3 and 5 of the North Carolina Constitution and Title 2, sections 2a and 2c of the United States Code. During the legislative process leading up to and following enactment, the defendant members of the General Assembly, including Senate President Pro Tempore Philip Berger, House Speaker Thom Tillis, Senate Redistricting Chair Robert Rucho, and House Redistricting Chair David Lewis, received legal advice from lawyers employed by the Attorney General of North Carolina and two private law firms, Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree Deakins") and Jones Day. Like the lawyers who are employed by the Attorney General, the Ogletree Deakins and Jones Day attorneys were paid with State funds.

On 2 September 2011, the Attorney General filed an action to preclear the redistricting plans in the United States District Court for the District of Columbia pursuant to Section five of the Voting Rights Act of 1965, *North Carolina v. Holder*, No. 1:11-CV-01592 (D.D.C. Sept. 2, 2011), and simultaneously sought administrative preclearance from the United States Attorney General. The redistricting plans were precleared administratively by the United States Attorney General on 1 November 2011. As a result, the federal district court dismissed as moot the State's preclearance action on 8 November 2011.

On 1 November 2011, the General Assembly also alerted the United States Department of Justice that an error in the computer software program used to draw the redistricting plans had caused certain areas of the state to be omitted from the original plans. The General Assembly passed legislation on 7 November 2011 to cure this technical defect. The United States Attorney General precleared the revised plans on 8 December 2011.

Meanwhile, plaintiffs, the North Carolina State Conference of Branches of the NAACP, League of Women Voters of North Carolina, Democracy North Carolina, North Carolina A. Philip Randolph Institute, and individual registered voters, filed separate suits on 3 and 4 November 2011, challenging the constitutionality of the redistricting plans and seeking a preliminary injunction to prevent defendants from conducting elections using the redistricting plans. In accordance with section 1-267.1 of the North Carolina General Statutes, the Chief Justice appointed a three-judge panel to hear both actions.

On 19 December 2011, the panel consolidated the cases. On the same day defendants filed their answers and moved to dismiss the suit. Thereafter, on 20 January 2012, the panel entered an order denying plaintiffs' motion for a preliminary injunction. The panel also entered an order on 6 February 2012 allowing in part and denying in part defendants' motion to dismiss.

Most relevant to the issues before us, on 8 and 17 November 2011, plaintiffs served requests for production of documents on defendants pursuant to Rule 34 of

the North Carolina Rules of Civil Procedure. These requests sought production of a variety of communications concerning enactment of the redistricting plans. After receiving an extension of time to respond, on 13 January 2012, defendants served written responses to plaintiffs' discovery requests, in which they objected to the production of certain categories of documents based upon the attorney-client privilege, legislative privilege, or work-product doctrine. On 24 February 2012, defendants amended their objections, providing additional information regarding their privilege claims. Specifically, defendants identified the following communications as privileged:

1.  Emails to and from Tom Farr, Phil Strach, Alec Peters, and Tiare Smiley to or from Bob Rucho, David Lewis, Thom Tillis, Phil Berger or their legislative staff members[1] acting on their behalf or at their direction regarding legal advice on the impact of census data on redistricting plans.

2.  Emails to and from Tom Farr, Phil Strach, Alec Peters, and Tiare Smiley to or from Bob Rucho, David Lewis, Thom Tillis, Phil Berger or their legislative staff members acting on their behalf or at their direction regarding legal requirements for a fair process under section 5 of the Voting Rights Act.

3.  Emails to and from Tom Farr, Phil Strach, Alec Peters, and Tiare Smiley to or from Bob Rucho, David Lewis, Nelson Dollar, Thom Tillis, Phil

---

[1] Defendants also stated that the term "legislative staff members" was limited to: (1) Jason Kay, General Counsel for Representative Tillis; (2) Tracy Kimbrell, General Counsel for Senator Berger; (3) Jim Blaine, Chief of Staff for Senator Berger; and (4) Brent Woodcox, redistricting counsel for Senators Berger and Rucho.

> Berger or their legislative staff members acting on their behalf or at their direction regarding legal advice in preparation for meetings of the House and Senate Redistricting Committees.
>
> 4.  Emails to and from Tom Farr, Phil Strach, Michael Carvin, Michael McGinley, Alec Peters, and Tiare Smiley to or from Bob Rucho, David Lewis, Nelson Dollar, Thom Tillis, Phil Berger or their legislative staff members acting on their behalf or at their direction regarding legal requirements for legislative and congressional districts.
>
> 5.  Emails to and from Tom Farr, Phil Strach, Michael Carvin, Michael McGinley, Alec Peters, and Tiare Smiley to or from Bob Rucho, David Lewis, Nelson Dollar, Thom Tillis, Phil Berger or their legislative staff members acting on their behalf or at their direction regarding legal advice regarding any public statements about redistricting or proposed redistricting plans.
>
> 6.  Emails to and from Tom Farr, Phil Strach, Michael Carvin, Michael McGinley, Alec Peters, and Tiare Smiley to or from Bob Rucho, David Lewis, Thom Tillis, Phil Berger or their legislative staff members acting on their behalf or at their direction regarding legal advice on the preclearance process for redistricting plans.
>
> 7.  Emails to and from Tom Farr, Phil Strach, Michael Carvin, Michael McGinley, Alec Peters, and Tiare Smiley to or from Bob Rucho, David Lewis, Nelson Dollar, Thom Tillis, Phil Berger or their legislative staff members acting on their behalf or at their direction regarding legal advice for the redistricting session of the General Assembly.

On 29 February 2012, plaintiffs filed a motion to compel discovery, seeking production of, among other things, "all communications between legislators and core

staff and all lawyers or consultants paid with state funds, and unredacted invoices and time sheets." In support of their motion, plaintiffs cited section 120-133 of the North Carolina General Statutes, which reads:

> Notwithstanding any other provision of law, all drafting and information requests to legislative employees and documents prepared by legislative employees for legislators concerning redistricting the North Carolina General Assembly or the Congressional Districts are no longer confidential and become public records upon the act establishing the relevant district plan becoming law.

N.C.G.S. § 120-133 (2011).[2] Plaintiffs argued that section 120-133 constitutes a "broad and unambiguous" waiver by the General Assembly of "any privileges" relating to redistricting communications once the relevant act becomes law. Plaintiffs contended that section 120-133 compelled the production of documents prepared by defendants' counsel, including lawyers from the Attorney General's Office and private firms.

On 11 April 2012, defendants responded to plaintiffs' motion, denying that section 120-133 waives, or even addresses, the common law attorney-client privilege or work-product doctrine or that the statute applies to the Attorney General's Office. Defendants' response included an engagement letter executed in 1991 by

---

[2] The term "legislative employee" is defined to include "consultants and counsel to members and committees of either house of the General Assembly or of legislative commissions who are paid by State funds." N.C.G.S. § 120-129(2) (2011). However, the term "legislative employee" excludes "members of the Council of State." *Id.* In addition, the term "document[s]" is defined to include "all records, papers, letters, maps . . . or other documentary material regardless of physical form or characteristics." N.C.G.S. § 120-129(1) (2011).

Daniel T. Blue, Jr., who then was serving as Speaker of the North Carolina House of Representatives, and outside counsel James E. Ferguson, II of Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A ("Ferguson Stein"). In the letter, Ferguson Stein agreed to provide legal advice to the North Carolina House of Representatives concerning redistricting. The letter stated that "[b]ecause communications between the firm and members of the House are privileged attorney-client communications, N.C.G.S. §[ ]120-133 shall not apply to communications, including written communications, between any attorneys in the firm and any member of the North Carolina House of Representatives."

On 20 April 2012, the three-judge panel entered a written order allowing plaintiffs' motion to compel. Most significantly, the panel concluded:

> 20.      Although certain communications by and between members of the General Assembly and legal counsel pertaining to redistricting plans may have originally been cloaked with privilege, the General Assembly, by enacting N.C. Gen. Stat. § 120-133, expressly waived any and all such privileges once those redistricting plans were enacted into law.
>
> 21.      This waiver is clear and unambiguous; it is applicable "notwithstanding any other provision of law." The waiver applies regardless of whether the privilege is claimed under a theory of attorney-client privilege, the work-product doctrine or legislative privilege.

Accordingly, the panel stated that "[a]ll drafting and information requests . . . to legislative employees" and "[d]ocuments . . . prepared by legislative employees" concerning the redistricting plans were " 'no longer confidential' " and became "

'public record' " when the redistricting plans were enacted. (underlining omitted). The panel concluded that counsel from Ogletree Deakins, Jones Day, and any legislative staff attorneys "were 'legislative employees' " because they "served as 'consultants and counsel' " to members of the General Assembly and were paid with State funds. The panel stated that this waiver of confidentiality "d[id] not extend to documents or communications to or from attorneys who were . . . members of the North Carolina Attorney General's staff because the Attorney General, [as] a member of the Council of State, is not a 'legislative employee' and neither are his staff attorneys."

The panel also concluded that any documents prepared "solely in connection with the *redistricting litigation*" remain confidential pursuant to the attorney-client privilege or work-product doctrine; however, the panel did not identify the specific documents to which the attorney-client privilege or work-product doctrine would apply. Instead, it invited the parties to negotiate "a reasonable means of identifying categories of documents that ought to remain confidential."

Defendants appealed to this Court as of right pursuant to section 120-2.5 of the North Carolina General Statutes. *See Pender Cnty. v. Bartlett*, 361 N.C. 491, 497, 649 S.E.2d 364, 368 (2007) (interpreting "N.C.G.S. § 120-2.5 to mean that any appeal from a three-judge panel dealing with apportionment or redistricting pursuant to N.C.G.S. § 1-267.1 is direct to" the Supreme Court of North Carolina), *aff'd sub. nom. Bartlett v. Strickland*, 556 U.S. 1, 173 L. Ed. 2d 173 (2009).

Defendants also asked the three-judge panel to stay its discovery order during the pendency of this appeal. The panel issued a temporary stay, but set an expiration date of 11 May 2012. Consequently, defendants filed a motion for temporary stay and petition for writ of supersedeas with this Court on 4 May 2012. On 11 May 2012, we allowed defendants' motion for temporary stay and petition for writ of supersedeas and expedited the hearing of this appeal.

Before this Court plaintiffs argue that they are entitled to all pre-enactment communications and documents relating to redistricting pursuant to section 120-133 of the North Carolina General Statutes. Plaintiffs contend that section 120-133 is unambiguous and by its plain language waives the right of legislators to assert the attorney-client privilege or work-product doctrine for communications and documents made during redistricting. In contrast, defendants argue that, strictly construed, section 120-133 only operates as a narrow waiver of legislative confidentiality that is codified in Article 17, Chapter 120 of the North Carolina General Statutes. Defendants therefore contend that section 120-133 does not waive their right to invoke the attorney-client privilege or work-product doctrine for communications and documents made before enactment of the redistricting plans. The parties agree that the attorney-client privilege and work-product doctrine apply to relevant post-enactment communications and documents.

This matter presents a question of statutory interpretation, which we review de novo. *In re Vogler Realty, Inc.*, __ N.C. __, __, 722 S.E.2d 459, 462 (2012). "The

primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 137 (1990). When there is no reference whatsoever to the attorney-client privilege in the statute, a clear and unambiguous waiver is absent, meaning the common law right to assert the privilege prevails. *See* N.C.G.S. § 4-1 (2011) ("All such parts of the common law as were heretofore in force and use within this State . . . and which has not been otherwise provided for in whole or in part, not abrogated, repealed or become obsolete, are hereby declared to be in full force within this State."). After carefully reviewing the parties' arguments, we conclude that section 120-133 cannot reasonably be construed to waive these common law doctrines because the section in no way mentions, let alone explicitly waives, the attorney-client privilege or work-product doctrine.

"The attorney-client privilege is one of the oldest recognized privileges for confidential communications. The privilege is intended to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 141 L. Ed. 2d 379, 384 (1998) (citations and quotation marks omitted). As such, "[t]he public's interest in protecting the attorney-client privilege is no trivial consideration . . . . The privilege has its foundation in the common law and can be traced back to the sixteenth century." *In*

*re Miller*, 357 N.C. 316, 328, 584 S.E.2d 772, 782 (2003) (citations omitted).

Although the privilege "is well-grounded in the jurisprudence of this State," *id.*; *see also* N.C.G.S. § 4-1, we emphasize that the privilege "has not been statutorily codified," *in re Miller*, 357 N.C. at 329, 584 S.E.2d at 783.

"[W]hen the relationship of attorney and client exists, all confidential communications made by the client to his attorney on the faith of such relationship are privileged and may not be disclosed." *Id.* at 328, 584 S.E.2d at 782 (citations and quotation marks omitted). Given that the privilege advances complete and frank communications, it "encourag[es] clients to make the fullest disclosure to their attorneys [and] enables the latter to act more effectively, justly and expeditiously." *Id.* at 329, 584 S.E.2d at 782 (citations and quotation marks omitted).

We are unaware of—and neither plaintiffs nor defendants have identified— any decisions by this Court fully abrogating the attorney-client privilege in any context as plaintiffs advocate here; however, the General Assembly itself has abrogated the attorney-client privilege on three occasions. In each instance the waiver has been clear and unambiguous. *See* N.C.G.S. § 15A-1415(e) (2011) (stating that a criminal defendant who alleges ineffective assistance of prior counsel "shall be deemed to waive the attorney-client privilege" to the extent that prior counsel "reasonably believes" revealing these privileged communications is "necessary to defend against the allegations"); *id.* § 78C-97(c) (2011) (stating that a student-athlete who enters into a representation agreement with an agent "will be deemed

to waive the attorney-client privilege" regarding certain records retained by the agent); *id.* § 127A-62(h)(3) (2011) (stating that a defendant who alleges ineffective assistance of prior counsel in court-martial proceedings "shall be deemed to waive the attorney-client privilege" to the extent that prior counsel reasonably believes revealing these privileged communications is "necessary to defend against the allegations").[3]

The text of section 120-133 includes no such clear and unambiguous waiver of the attorney-client privilege or work-product doctrine. Instead, section 120-133 states only:

> Notwithstanding any other provision of law, all drafting and information requests to legislative employees and documents prepared by legislative employees for legislators concerning redistricting the North Carolina General Assembly or the Congressional Districts are no longer confidential and become public records upon the act establishing the relevant district plan becoming law.

*Id.* § 120-133. There is no reference in this section to either the attorney-client privilege or work-product doctrine. "[I]t is always presumed that the Legislature

---

[3] In two additional instances the General Assembly has addressed the waiver of the attorney-client privilege more obliquely but nevertheless without ambiguity. In section 7A-450(d) the privilege is waived for indigent persons to the extent that if the "person . . . becomes financially able to secure legal representation and provide other necessary expenses of representation, he must inform the counsel appointed by the court to represent him of that fact . . . . and counsel must promptly inform the court of that information." N.C.G.S. § 7A-450(d) (2011). Such information is specifically excluded by the statute from the protection of the privilege. *Id.* In addition, section 44-50.1(a) mandates that "[if] the person distributing settlement or judgment proceeds [from a personal injury action] is an attorney, the accounting [of disbursements] required by . . . section [44-50.1] is not a breach of the attorney-client privilege." N.C.G.S. § 44-50.1(a) (2011).

acted with full knowledge of prior and existing law." *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 695, 239 S.E.2d 566, 570 (1977). Necessarily, this presumption must include the common law. *See* N.C.G.S. § 4-1. In contrast, the General Assembly has set a clear limitation on the attorney-client privilege in the Public Records Act. N.C.G.S. § 132-1.1(a) (2011). There the legislature placed a three-year restriction on the length of time that a confidential communication between an attorney and a public client—such as "any public board, council, commission or other governmental body of the State or of any county, municipality or other political subdivision or unit of government"—may remain unavailable for public inspection. *Id.*

Plaintiffs argue that the phrase "[n]otwithstanding any other provision of law" in section 120-133 waives "any privileges" regarding redistricting legislation. Nonetheless, we begin by observing that the statute does not define the term "provision" in Article 17. "In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute." *Perkins v. Ark. Trucking Servs., Inc.*, 351 N.C. 634, 638, 528 S.E.2d 902, 904 (2000). *Black's Law Dictionary* defines "provision" as "[a] clause in a *statute*, contract, or other legal instrument." *Black's Law Dictionary* 1345 (9th ed. 2009) (emphasis added). This definition suggests that the General Assembly's use of the word "provision" was meant to refer only to other statutory clauses and not to common law doctrines such as the attorney-client privilege and work-product doctrine.

Plaintiffs' counsel conceded as much during oral argument. This interpretation is bolstered by the fact that the General Assembly repeatedly has demonstrated that it knows how to be explicit when it intends to repeal or amend the common law. *See, e.g.*, N.C.G.S. § 48A-1 (2011) ("The common-law definition of minor insofar as it pertains to the age of the minor is hereby repealed and abrogated."); *id.* § 50-6 (2011) ("Notwithstanding the provisions of G.S. 50-11, or of the common law, a divorce under this section shall not affect the rights of a dependent spouse with respect to alimony which have been asserted in the action or any other pending action."); *id* § 160A-626(b) (2011) ("The Authority may contract with any railroad to allocate financial responsibility for passenger rail services claims, . . . notwithstanding any other statutory, common law, public policy, or other prohibition against same . . . ."); *see also id.* § 36C-8-816.1(g) (2011) (recognizing that the phrase "provision of law" does not refer to the common law by stating: "Nothing in this section shall be construed to abridge the right of any trustee who has a power to appoint property in further trust that arises under the terms of the original trust or under any other section of this Chapter or under another provision of law or under common law.").

We read section 120-133 in the context of the entire article in which it appears. *See In re D.S.*, 364 N.C. 184, 187, 694 S.E.2d 758, 760 (2010). Doing so militates against the conclusion that the General Assembly intended to waive its attorney-client privilege and work-product doctrine. As we have noted in other

cases, the title of an act may be an indication of legislative intent. *See, e.g.*, *State v. Flowers*, 318 N.C. 208, 215, 347 S.E.2d 773, 778 (1986) (relying on the title of N.C.G.S. § 15A-136 to support the Court's conclusion that the statute addresses a matter of venue). Section 120-133 appears in Chapter 120, Article 17 of the General Statutes and is entitled "Confidentiality of Legislative Communications." In light of this title, we may reasonably infer that Article 17 was intended to govern a specific class of communications. Indeed, a North Carolina House of Representatives Resolution introduced in 1983, shortly before Article 17 was enacted, requested a Legislative Research Commission study pertaining to confidentiality of "legislative communications." *See* H.R. Res. 1461, 1983 Gen. Assemb., Reg. Sess. (N.C. 1983). As such, Article 17 governs an important aspect of the General Assembly's internal operations. In contrast to the Public Records Act, which was designed to *disclose* documentary material of State government agencies or subdivisions to facilitate public inspection and examination, Article 17 was enacted to *protect* legislative communications from disclosure so as to preserve the integrity of the legislative process. *Compare* N.C.G.S. § 132-1(b) (2011) (stating that "public records and public information . . . are the property of the people" and "it is the policy of this State that the people may obtain copies of their public records and public information") *with id.* §§ 120-131, -131.1 (2011) (emphasizing that specified legislative communications "are confidential" or "shall be kept confidential"). In fact, according to a 1984 Legislative Research Commission report, Article 17 was

created to address concerns that the General Assembly's common law legislative privilege could be eroded by an expansive reading of the Public Records Act. *See* N.C. Legislative Research Comm'n, *Confidentiality of Legislative Communications*, 1983 Gen. Assemb. (1984 Reg. Sess.) 2 (June 7, 1984) ("[S]ince its enactment in 1935, the public records law had been read much more broadly than originally intended."). We also note that the General Assembly's specific use of the term "confidential" thirteen times throughout Article 17, *see, e.g.*, N.C.G.S. § 120-130(a), -131(a), -131.1(a), (a1) (2011) (stating, for example, "is confidential," "are confidential," and "shall be kept confidential"), demonstrates that Article 17 was enacted to shield legislative communications from disclosure.

Operationally, Article 17 places a veil of confidentiality over several specific legislative communications: (1) drafting and information requests made to legislative employees by legislators, N.C.G.S. § 120-130 (2011); (2) documents produced by legislative employees upon the request of legislators, *id.* § 120-131 (2011); and (3) requests from legislative employees to employees in other State agencies for assistance in the preparation of fiscal notes and evaluation reports, *id.* § 120-131.1 (2011). Article 17 also prohibits legislative employees from disclosing confidential information obtained in the legislative context. *Id.* § 120-132 (2011). Moreover, Article 17 expressly states that these legislative communications are *not* public records pursuant to the Public Records Act. *See id.* §§ 120-130(d), -131(b), -131.1(a1).

Section 120-133 provides a narrow exception to the protections generally established in Article 17 to help ensure the State's compliance with the requirements of the Voting Rights Act. *See* 42 U.S.C. § 1973c (2012) (outlining the preclearance procedure); 28 C.F.R. § 51.27 (2012) (listing the "[r]equired contents" of a "submitted change affecting voting"); *id.* § 51.28 (2012) (listing supplemental contents for submissions). In effect, section 120-133 permits "all drafting and information requests to legislative employees and documents prepared by legislative employees for legislators concerning redistricting" to become "public records" for this limited purpose. N.C.G.S. § 120-133. We observe that, in contrast to the other sections of Article 17, section 120-133 makes no reference to the Public Records Act. We presume that the General Assembly "carefully chose each word used" in drafting the legislation. *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009). The General Assembly could have referenced the Public Records Act in section 120-133, but chose not to do so. This omission demonstrates that the General Assembly intended for its redistricting communications to be made public in accordance with the narrow scope of section 120-133, rather than the broad scope of the Public Records Act. Given the limited purpose of section 120-133 as read within the full context of Article 17, we can discern no clear legislative intent by the General Assembly to waive the common law attorney-client privilege or work-product doctrine.

As a part of our analysis of section 120-133, we must also emphasize that this

Court operates within a "tripartite system of government." *Bacon v. Lee*, 353 N.C. 696, 712, 549 S.E.2d 840, 851, *cert. denied*, 533 U.S. 975, 150 L. Ed. 2d 804 (2001). "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. "[T]he principal function of the separation of powers[ ] . . . is to maintain the tripartite structure of the . . . Government—and thereby protect individual liberty— by providing a safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Bacon*, 353 N.C. at 715, 549 S.E.2d at 853 (alterations in original) (quotation marks omitted). As such, "the fundamental law guarantees to the Legislature the inherent right to discharge its functions and to regulate its internal concerns in accordance with law without interference by any other department of the government." *Person v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 503, 115 S.E. 336, 339 (1922). "All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *State ex rel. Martin v. Preston*, 325 N.C. 438, 448-49, 385 S.E.2d 473, 478 (1989). The General Assembly can waive its common law rights in addition to its statutory rights, and whether it chooses to do so is not within the purview of this Court. Nevertheless, we will not lightly assume such a waiver by a coordinate branch of government. Therefore, without a clear and unambiguous statement by the General Assembly that it intends to waive its attorney-client privilege or work-

product doctrine, we are compelled to exercise judicial restraint and defer to the General Assembly's judgment regarding the scope of its legislative confidentiality. Such a clear and unambiguous statement is notably absent from section 120-133. Accordingly, we must conclude that the General Assembly did not intend to waive the attorney-client privilege or work-product doctrine with respect to redistricting litigation when it enacted section 120-133.

For the foregoing reasons, we reverse the three-judge panel's conclusion of law that the General Assembly waived the attorney-client privilege and work-product doctrine for pre-enactment communications and documents through section 120-133; however, we affirm the panel's conclusion that the attorney-client privilege and work-product doctrine apply to relevant post-enactment communications and documents. This case is remanded to the three-judge panel for additional proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; and REMANDED.

Justice BEASLEY did not participate in the consideration or decision of this case.

Justice HUDSON dissenting.

Because I am concerned that in its opinion the majority has abandoned the principle that confidentiality is the basis for attorney-client privilege, I respectfully dissent. While the majority's extensive analysis of the history and purpose of the attorney-client privilege and Article 17 is interesting, it fails to address the fundamental premise that the attorney-client privilege applies only to confidential communications. In N.C.G.S. § 120-133, the General Assembly has explicitly stripped confidentiality from redistricting communications upon enactment of the redistricting law. For many years, our law has established that without confidentiality, no attorney-client privilege can apply.

It is well established that the attorney-client privilege "protects *confidential* communications made by a client to his attorney." *State v. Fair*, 354 N.C. 131, 168, 557 S.E.2d 500, 525 (2001) (emphasis added) (citation omitted), *cert. denied*, 535 U.S. 1114, 122 S. Ct. 2332 (2002). Importantly, "the attorney-client privilege covers *only* confidential communications." *State v. Brown*, 327 N.C. 1, 20, 394 S.E.2d 434, 446 (1990) (emphasis added) (citation omitted). Even communications between attorney and client made in public or in front of others can lose their confidential nature and thus the protection of the privilege. *See State v. Van Landingham*, 283 N.C. 589, 602, 197 S.E.2d 539, 547 (1973). Confidentiality is a *prerequisite* to application of the attorney-client privilege—information that is not confidential simply is not subject to the privilege.

Defendants seek to protect much of their legislative redistricting work from public scrutiny under the cloak of attorney-client privilege; however, the relevant statutory language could not be clearer in indicating that the privilege is *inapplicable* here, making waiver irrelevant. The pertinent language of the statute reads: "Notwithstanding any other provision of law, all drafting and information requests to legislative employees and documents prepared by legislative employees for legislators concerning redistricting . . . *are no longer confidential* and become public records upon the act establishing the relevant district plan becoming law." N.C.G.S. § 120-133 (2011) (emphasis added).

There is nothing unclear or ambiguous about the statutory phrase "are no longer confidential." This Court has long held that "when the language of a statute is clear and unambiguous, there is no room for judicial construction, and the courts must give it its plain and definite meaning." *Lanvale Props., LLC v. Cnty. of Cabarrus*, ___ N.C. ___, ___, 731 S.E.2d 800, 809-10 (2012) (citations and quotation marks omitted). The unequivocal statutory language here can be summed up quite simply: as of 7 November 2011, the dates that this redistricting plan finally became law, all prior "drafting and information requests" and "documents" concerning redistricting ceased to be confidential. Therefore, these requests and documents cannot be covered by the attorney-client privilege, which applies only to confidential communications. This case does not concern a broad waiver of various privileges—

the nonconfidential communications in question are simply beyond the protection of the attorney-client privilege, even if they once were protected.

The majority spends its entire opinion in a confusing and unnecessary attempt to prove a negative—that the phrase "attorney-client privilege" does not appear in the text of the statute and therefore, the privilege cannot be considered waived or abrogated thereby. Meanwhile, the majority never addresses, let alone explains, how communications that are "no longer confidential" (a phrase that actually *is* in the statutory text) can be covered by a common law privilege that has never applied to nonconfidential communications. The only way to reach this conclusion is by suggesting that the word "confidential" in the statute means something other than "confidential." And as the majority points out, we presume that the legislature "carefully chose each word used," *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009), and "that the Legislature acted with full knowledge of prior and existing law," *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 695, 239 S.E.2d 566, 570 (1977). Therefore, we must presume that the General Assembly deliberately used the words "are no longer confidential" with full knowledge that a requisite element of the common law attorney-client privilege is that the communications are, and remain, confidential.[4]

---

[4] If, as the majority suggests, section 120-133 was written as a "narrow exception" solely intended to "ensure compliance with the requirements of the Voting Rights Act," surely the General Assembly could and would have said so. Courts "are without power to interpolate, or superimpose, provisions and limitations not contained [in the statute]." *State v. Davis*, 364 N.C. 297, 302, 698 S.E.2d 65, 68 (2010) (citations omitted).

Even the authorities cited by the majority repeatedly and explicitly refer to confidentiality as the basis for this privilege. *See Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S. Ct. 2081, 2084 (1998) (noting that "[t]he attorney-client privilege is one of the oldest recognized privileges for confidential communications"); *In re Miller*, 357 N.C. 316, 328, 584 S.E.2d 772, 782 (2003) (stating that "this protection for confidential communications is one of the oldest and most revered in law"); N.C.G.S. §§ 120-129 to -139 (2011) (titled "Confidentiality of Legislative Communications"); N.C.G.S. § 132-1.1(a) (2011) (exempting certain "Confidential Communications" from the definition of "public records" for three years).

In this opinion the majority has either repudiated the long-standing rule that only confidential communications are entitled to the protection of the attorney-client privilege, which is inconsistent with all prior authority; or, it has rewritten N.C.G.S. § 120-133 to say, instead of "are no longer confidential," that redistricting communications "continue to be confidential," which is inconsistent with our role as a reviewing court rather than a legislative body. As a result, the majority has unnecessarily muddled the law in this area to reach its result, and made any future cases in this area of law unpredictable.

Because I conclude that the attorney-client privilege does not apply here, I find it necessary to briefly analyze what the statute renders nonconfidential— "drafting and information requests" and "documents" "concerning redistricting." N.C.G.S. § 120-133. While the statute does not define "drafting and information

requests," it does provide a very specific and quite broad definition of "documents." For the purposes of this statute, "document" means "all records, papers, letters, maps, books, photographs, films, sound recordings, magnetic or other tapes, electronic data-processing records, artifacts, or other documentary material regardless of physical form or characteristics." *Id.* § 120-129(1) (2011). While the statute does not explicitly use the term "e-mail," I conclude that this statutory definition that includes "letters . . . regardless of physical form or characteristics" necessarily includes electronic mail, which is what plaintiffs seek to discover here. Moreover, the statute expressly applies to outside counsel for members of the General Assembly. The definition of "[l]egislative employee" expressly includes "counsel to members and committees of either house of the General Assembly . . . who are paid by State funds." *Id.* § 120-129(2) (2011).

In sum, the plain and unambiguous terms of the statute provide that all documents (including e-mails) concerning redistricting, even those between legislators and outside counsel, ceased to be confidential upon final enactment of the law on 7 November 2011. Because N.C.G.S. § 120-133 renders these communications "no longer confidential" upon enactment of the districts (and because this litigation commenced after enactment of the law), the attorney-client privilege cannot apply.

While the majority offers no analysis of the work-product doctrine, I see no reason to believe that N.C.G.S. § 120-133 has any effect on the application of that

doctrine here because work-product doctrine is not premised upon the confidentiality of communications. Work-product doctrine is "designed to protect the mental processes of the attorney," specifically his "impressions, opinions, and conclusions or his legal theories and strategies." *State v. Hardy*, 293 N.C. 105, 126, 235 S.E.2d 828, 841 (1977). This Court has stated that work-product doctrine is "not a privilege," but rather a "qualified immunity" that "extends to all materials prepared in anticipation of litigation or for trial." *Willis v. Duke Power Co.*, 291 N.C. 19, 35, 229 S.E.2d 191, 201 (1976) (citation, emphasis, and quotation marks omitted).[5] It is important not to overstate this protection, however, as the phrase "prepared in anticipation of litigation" does not mean "prepared *while* anticipating litigation." The fact that redistricting litigation is virtually inevitable every ten years does not cloak every redistricting document with work-product protection. While work-product protection is broad for those materials prepared for litigation, it does not extend to any and all materials prepared in a situation in which litigation is likely. As the Fourth Circuit has stated, only those materials prepared specifically "*because* of" litigation are protected, not those that are created "with the general possibility of litigation in mind." *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992).

---

[5] Other cases have referred to the doctrine as a "qualified privilege" while retaining the parameters of the protection described in *Willis*. *E.g. Hardy*, 293 N.C. at 126, 235 S.E.2d at 840.

In addition, "[m]aterials prepared in the ordinary course of business are not protected." *Willis*, 291 N.C. at 35, 229 S.E.2d at 201 (citation omitted); *See Nat'l Union Fire Ins.*, 967 F.2d at 984. Maps, tables, plans, and other materials and discussions related to the actual writing of the redistricting legislation are obviously prepared in the ordinary course of business of the legislature. Even an analysis of the constitutional framework for redistricting would seem to me to be within the ordinary course of a legislature's fulfilling its constitutional responsibility to rewrite the districting legislation. Thus, any documents that relate to the *substance* of the redistricting legislation (decisions on where to draw district lines, analysis of census data, etc.) should not be covered by work-product protection. Communications regarding strategic preparation for preclearance litigation, for example, might well be covered, and the trial court can address such matters as document production moves forward.

Finally, the work-product doctrine gives only a "qualified immunity," not an absolute shield. *Willis*, 291 N.C. at 35, 229 S.E.2d at 201. "Upon a showing of 'substantial need' and 'undue hardship' involved in obtaining the substantial equivalent otherwise, plaintiff may be allowed discovery." *Id.* at 36, 229 S.E.2d at 201. Because the materials necessary to show whether the legislature violated the basic rules of redistricting as set forth by the U.S. Supreme Court may well lie among those documents now claimed as privileged, plaintiffs may have a reasonable claim to an exception to work-product protection. This determination should be left

to the trial court. Here, as in *Willis*, "a large portion of the materials in defendant's . . . files may be subject to the trial preparation immunity. The record is insufficient for us to determine the extent to which this may be the case." *Id.*

In its order here, the trial court ruled that N.C.G.S. § 120-133 requires defendants to produce certain material pertaining to the redistricting process without regard to attorney-client privilege, legislative privilege, or work-product doctrine. The order states that "because the record before the Court at this time does not permit the Court to rule with any specificity which documents might be excluded from the scope of § 120-133 . . . the Court can only suggest that the parties consider and agree among themselves a reasonable means of identifying categories of documents that ought to remain confidential." In my opinion, the trial court erred in leaving responsibility for these determinations entirely in the hands of the parties; the trial court should conduct an *in camera* review and resolve any issues on which the parties cannot agree. *See In re Miller*, 357 N.C. at 336, 584 S.E.2d at 787 (stating that "the responsibility of determining whether the attorney-client privilege applies belongs to the trial court"). To the extent there is any argument about whether a particular communication meets the statutory definition of "document" or whether it is "concerning redistricting," the only appropriate remedy consistent with the rules of Civil Procedure and prior case law is an *in camera* review by the trial court. "If . . . there is disagreement about whether the order covers certain questionable documents or communications, the superior court must

conduct an *in camera* review to determine the extent of the order as to those documents or communications." *State v. Buckner*, 351 N.C. 401, 411-12, 527 S.E.2d 307, 314 (2000). Here, it is the trial court's responsibility to determine whether disputed materials are "documents" within the meaning of the statute, whether they are "concerning redistricting,"[6] and whether work-product doctrine protects such documents (or portions thereof) nonetheless. I would so hold and remand for the trial court to proceed accordingly.

In conclusion, the majority has analyzed at length an issue that is not really presented here while failing to address the substantial issues presented on appeal. I would hold that documents listed in N.C.G.S. § 120-133 are not subject to attorney-client privilege because, following enactment of the redistricting legislation on 7 November 2011, those documents are not confidential. I would reverse the trial court's order insofar as it found a broad waiver of privilege and remand for *in camera* review of any and all disputed documents. Those that relate to the legislative process of redistricting and were confidential before enactment should be open to discovery. Should defendants assert work-product protection of any material, any such claims should also be subject to *in camera* review and a ruling by the trial court.

For the reasons stated here, I respectfully dissent.

---

[6] Obviously, any materials that are not "documents" or are not "concerning redistricting" would still be eligible for attorney-client privilege if they meet the common law requirements of that privilege.