An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-722

Filed 3 June 2026

Guilford County, Nos. 24JA000361-400, 24JA000362-400

IN THE MATTER OF: N.R. AND I.R.

Appeal by respondent from orders entered 1 April 2025, 22 April 2025, and 7 October 2025 by Judge Angela C. Foster in Guilford County District Court. Heard in the Court of Appeals 19 May 2026.

> *Reeves Divenere & Wright, by Anné C. Wright, for respondent-appellant father.*
>
> *Mercedes O. Chut, for petitioner-appellee Guilford County Department of Health and Human Services.*
>
> *Michelle FormyDuval Lynch, for Guardian ad Litem.*

DILLON, Chief Judge.

In this case Respondent-Father Dwayne Roberson ("Father") appeals the trial court's adjudication, disposition, and custody orders of his minor children, Nolan and Indy.[1] After review of the issues Father has raised on appeal, we affirm.

---

[1] *See* N.C. R. App. P. 42(b) (pseudonyms are used to protect the identity of the minor child). Indy and Nolan have the same father, Father, but different mothers.

I.     Background

Indy's parents brought Indy to Triad Pediatrics to visit her pediatrician over congestion and allergy concerns.  As it turns out, Indy was severely malnourished, and her pediatrician diagnosed Indy with failure to thrive and recommended she "go[ ] directly to the emergency department" because of Indy's poor weight gain.  After leaving Triad Pediatrics, but before arriving at Moses Cone Emergency Department, Father researched hospitals for four hours to determine which hospital would be "more in line with his holistic and religious beliefs," despite being told to go "directly to the emergency department[.]"

Dr. Pettigrew, the attending at Moses Cone, testified about Indy's growth compared to other female infants based on growth charts, noting that she was in the 94th percentile when she was born, but had dropped to the 0.09th percentile just six months later.  Dr. Pettigrew also testified there was no medical reason preventing Indy from gaining weight.  Through conversations with Father and Indy's mother ("Mother"), it was revealed that Mother's breast milk production began to decrease, and the parents supplemented the breast milk with donor milk and certain pureed foods.

However, Dr. Pettigrew testified that while parents can introduce food and juices on top of breast milk, they are "not to be used for main nutrition sources or main caloric sources."  In short, Dr. Pettigrew's medical notes and testimony

indicated that Indy was severely malnourished based on an "inadequate caloric intake" and that Indy had been underfed for approximately one month.

While Indy was at Moses Cone, Guilford County Department of Health and Human Services ("DHHS") became involved. Through DHHS's investigation, a social worker interviewed Nolan, and Nolan informed the social worker he had been exposed to domestic violence between Father and Mother.

DHHS filed juvenile petitions regarding Nolan and Indy alleging neglect. After a hearing, the trial court adjudicated both Nolan and Indy neglected via order entered 1 April 2025. After the dispositional hearing, the trial court, by order, continued to suspend Father's visitation with Nolan and Indy, gave Nolan's mother legal and physical custody of Nolan, transferred Nolan's matter to a Chapter 50 custody action, and maintained DHHS involvement with respect to Indy. Thereafter, the trial court entered the Chapter 50 custody order as to Nolan. Father appeals.

## II. Analysis

Father raises several issues on appeal, which we address in turn.

### A. Denial of Fair Procedures

Father argues the trial court deprived him of fair procedures due to its failure to recuse itself after demonstrating hostility and bias towards Father during its examination of Father and its failure to include a Google search about Muslim vaccination practices in the record. We disagree.

Father does not argue that the trial court could not examine Father while he was testifying at the adjudication hearing. Indeed, "[t]he court may interrogate witnesses, whether called by itself or by a party." N.C.G.S. § 8C-1, Rule 614(b); *see also In re J.R.*, 383 N.C. 273, 279 (2022) ("[T]here are times in the course of a trial, when it becomes the duty of the judge to propound competent questions in order to obtain a proper understanding and clarification of the testimony of the witness or to bring out some fact that has been overlooked. . . . [With respect to Rule 614(a) and (b),] a trial court [does not] shed its impartiality or abandon its role as an independent decisionmaker." (cleaned up)). Rather, Father argues that such questioning was replete with bias and hostility culminating in the court's erroneous decision not to include its Google search as part of the record.[2]

First, we disagree with Father's argument that the trial court exhibited bias and hostility while examining Father, which in turn deprived Father of a fair trial.

"Public confidence in the courts requires that cases be tried by unprejudiced and unbiased judges." *In re Belk*, 364 N.C. 114, 122 (2010) (citation omitted). In the context of ensuring impartiality, this Court has explained that we must examine the totality of the circumstances in our assessment of whether statements made by the trial court are improper, and even if they are, such comments are harmless "[u]nless it is apparent that [the comment] might reasonably have had a prejudicial effect on

---

[2] The Guardian Ad Litem argues Father failed to properly preserve these issues. In light of our resolution of these issues, we presume without deciding that they were properly preserved.

the result of the trial." *State v. Mack*, 161 N.C. App. 595, 598 (2003) (cleaned up).

After a review of the record and based on the totality circumstances, the trial court's questioning of Father did not exhibit bias or hostility. Indeed, the trial court's questions reveal an attempt to clarify Father's testimony due to several occasions where his testimony was unclear and confusing. *See In re J.R.*, 383 N.C. at 279–80.

Second, even presuming it was error, the trial court's refusal to enter the Google search into the record was not prejudicial to the trial court's finding on Father's credibility. *See In re T.M.L.*, 377 N.C. 369, 374 (2021) ("An appellant must not only show error; he must show that the error was prejudicial." (citation omitted)).

Our review of the record reveals Father's testimony was inconsistent, evasive, and contradictory. Also, the trial court's adjudication order makes no mention that Father's children were not vaccinated; and as result, he has failed to show how the Google search about vaccinations prejudiced him. Thus, we conclude any purported error was harmless.

## B. Neglect of Indy

Next, Father argues the trial court erred in adjudicating Indy neglected. We disagree.

### 1. Standard of Review

At the adjudication stage, the allegations in the petition "shall be proved by clear and convincing evidence[,]" N.C.G.S. § 7B-805, and we review the adjudication to determine if the conclusions of law are supported by the findings of fact, and the

findings of fact are supported by the evidence, *In re K.S.*, 380 N.C. 60, 64 (2022) (citation omitted). "Clear and convincing evidence is evidence which should fully convince." *In re J.A.G.*, 172 N.C. App. 708, 712 (2005) (cleaned up).

Findings that are supported by clear and convincing evidence are "conclusive" despite evidence that could support a different finding. *In re J.A.M.*, 372 N.C. 1, 8 (2019). If a finding lacks sufficient evidentiary support, we "must disregard that finding and examine whether the remaining findings support the trial court's determination." *In re A.J.*, 386 N.C. 409, 412 (2024) (citation omitted). However, when only a portion of a finding is not properly supported, we need only disregard the unsupported portion of the finding. *In re S.R.F.*, 376 N.C. 647, 656 (2021). Unchallenged findings are binding on appeal. *In re J.M.*, 384 N.C. 584, 591 (2023) (citation omitted).

We review de novo the issue of whether a trial court's findings support its conclusions of law. *In re T.M.L.*, 377 N.C. at 375 (citation omitted). In our review, we "consider[ ] the matter anew and freely substitute[ ] [our] own judgment for that of the [trial court]. *Id.* (citations omitted and fourth alteration in original). "The trial judge's decisions as to the weight and credibility of the evidence, and the inferences drawn from the evidence are not subject to appellate review." *In re D.W.P.*, 373 N.C. 327, 330 (2020) (citation omitted).

2. Findings of Fact 16, 17, 18

First, we examine Father's challenges to Findings of Fact 16, 17, and 18. At the adjudication hearing, the trial court allowed Social Worker Supervisor Melissa McClary to testify to statements made in a report initiated by Social Worker Charles Key under the business records exception to the rule against hearsay. *See* N.C.G.S. § 8C-1, Rule 803(6). However, the report was not entered into evidence as a "business record." Thus, after each time Supervisor McClary began to testify about what Social Worker Key "said" in the report, Father's attorney objected. Thus, Father contends we must disregard Findings 16–18 as unsupported.

For purposes of this appeal, we presume this was error. Defendant notes our Supreme Court has held that it was error for a trial court to admit certain testimony regarding a police officer's report after "the State did not offer in evidence the report [the police officer] filed," and thus "any discussion of police reports . . . [was] neither necessary nor appropriate." *State v. Van Landingham*, 283 N.C. 589, 602–03 (1973).

The Court, however, concluded that "the error was cured" because "testimony of like import was admitted thereafter without objection." *Id.* at 603. The Court explained the "well[-]established rule" that "when incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost . . . ." *Id.* (citations and internal marks); *see also State v. Crane*, 269 N.C. App. 341, 343 (2020).

We conclude Findings 16 and 17 and parts of Finding 18 are supported by competent evidence despite the trial court's purported error in allowing Supervisor

McClary to testify as to Social Worker Key's report. This is so because other similar testimony cured any error resulting from the fact the report was not offered into evidence.[3] *See id.* at 603. With respect to the latter portion of Finding 18 pertaining to Social Worker Key's discussions with Father regarding a safety assessment and attempted implementation of a safety plan, certain aspects of this finding are supported only by inadmissible hearsay. Thus, we disregard this *portion* of Finding 18. *See In re S.R.F.*, 376 N.C. at 656.

### 3. Finding of Fact 27

Next Father challenges Finding of Fact 27, which found that medical personnel told the parents Indy required immediate medical attention and that Indy did not receive proper care from her parents "in that she was diagnosed with failure to thrive in the parents' care."[4]

---

[3] For instance, part of Finding 18 reads that "[t]he [parents] did not believe in synthetic formula as a substitute for breast milk due to their religious beliefs[,]" a fact alluded to by Father when he explained he and his children ate only pure foods due to their Islamic beliefs. Another example would be found in Finding 17 where it states the parents brought Indy initially to Triad Pediatrics for congestion and allergy concerns which again is something Father testified to later on. Also, both Findings 17 and 18 have statements to the effect that Indy was not receiving enough breast milk as she needed and that Father and Mother attempted to supplement the decrease in milk by other means. Dr. Pettigrew testified about proper feeding requirements and that Mother's breast milk production had dwindled. Similarly, Dr. Pettigrew testified that the parents were giving Indy merely 6 ounces of breast milk a day as well as juice and pureed food and also testified a six-month child needed between 24 to 32 ounces of breast milk per day to provide sufficient nutrition. Basic math leads to the trial court's finding in Finding 17 that "[Indy] was not receiving enough breast milk and should have been receiving five times the amount of formula per day than she was currently intaking." Finally, regarding Finding 16, there was competent evidence that while at Moses Cone Father's presence seemingly shut down Mother as Social Worker Dargan testified that Mother informed Social Worker Dargan that Father, and not Mother, "makes the decisions." And Father himself testified that he interacted with Social Worker Key.

[4] To the extent that Father challenges the evidentiary portion Finding 27 more generally, we conclude that portion is supported by sufficient evidence.

Finding of Fact 27 begins by stating:

> The juveniles were brought into [DHHS's] custody either through the [parent's] actions or failure to react in an appropriate manner regarding [Indy's] medical care *plac*[ing] *every one of the juveniles at a substantial risk of physical harm and the juveniles*[ ] *[were] living in an environment injurious to their welfare. The parents did not provide proper care for [Indy]* in that she was diagnosed with failure to thrive while in the parents' care.

(Emphasis added.)

The italicized portions of Finding of Fact 27 are the trial court's ultimate finding. *See In re G.C.*, 384 N.C. 62, 65 n.3 (2023); *id.* at 66–67 (concluding that findings stating a juvenile "lived in an environment injurious to [the juvenile's] welfare" and "[did] not receive proper care[ ]" were "properly characterized as ultimate findings").[5] The trial court proceeded to announce its "evidentiary facts:"

> In making this determination, the Court has considered the evidence that [Indy] had not been seen by a pediatrician or had a well-child check since she was four months old. On March 19, 2024, [Indy] was finally seen at Triad Pediatrics and was diagnosed with failure to thrive. It was recommended that she be taken to Brenner's Children's Hospital as she required immediate medical attention. The [parents] were reluctant to follow the advice of the treating pediatrician and only acquiesced due to their perceived "threat" of [DHHS's] involvement. Although being told that [Indy] required immediate medical attention due to her diagnosis, [Father] researched

---

[5] Similarly, the portion of "Finding" 31 which states "[Father] does not provide proper care or supervision[,] and created or allowed to be created a living environment that is injurious to the juveniles' welfare[ ]" is also an ultimate finding of fact. *See id.* The portion this "Finding" stating that Indy and Nolan were neglected, however, is more properly characterized as a conclusion of law. *See In re L.C.*, 387 N.C. 475, 479–80 (2025) (reiterating that a determination of neglect is a conclusion of law).

hospitals, more in line with his holistic and religious beliefs, for approximately four hours, before seeking medical care, and [Mother] returned to work.

With respect to whether Indy required immediate medical attention, Dr. Pettigrew testified that: "there was concern that there was poor weight gain, and that caused the pediatrician [(at Triad Pediatrics)] to recommend *going directly to the emergency department*, which is standard of care when we're concerned about weight loss . . . or poor weight growth." Father also testified that Triad Pediatrics told him Indy "needed emergency care." Thus, the portion of Finding 27 stating that Indy required "immediate medical attention" is supported by sufficient evidence.

Next Father challenges the portion of that Finding 27 stating, "the parents did not provide proper care for [Indy] in that she was diagnosed with failure to thrive while in the parents' care." However, this ultimate finding is supported by the evidentiary findings, which are in turn supported by the evidence.

Dr. Pettigrew testified and evidence indicated that: Indy did not have a medical condition which would have prevented weight gain; it would have taken Indy at least a month to get to her low weight; Indy's "severe malnutrition" was due to "inadequate caloric intake[;]" and she "appeared wasted and malnourished on exam[,] . . . [had] limited subcutaneous fat stores and notable temporal wasting[,] . . . [and] [had] decreased upper and lower extremity tone." What this effectively meant was that Indy was not properly fed by Father and Mother, was severely malnourished as seen by a decreased supply of fat storage as well as a decrease in muscle tone. The severe

malnourishment coupled with the delay Father took in researching hospitals despite the pressing emergency supports the trial court's ultimate finding that the parents, specifically Father, failed to provide proper care.  Thus, this portion of Finding 27 is also properly supported.

### 4.  Finding of Fact 28

Next, Father challenges a portion of Finding 28 to the extent the finding states Father "wanted to remove [Indy] from the hospital against medical advice and placed [his] religious beliefs before the well[-]being of the juvenile[.]"  Based on the testimony of an attending nurse, her accompanying report, and Father's own testimony, Finding 28 is properly supported by the evidence.

### 5.  Finding of Fact 29

Finally, Father challenges Finding 29 wherein the trial court stated "the parents should have known [Indy] was not gaining weight[ ]" "when she presented to the hospital" due to Indy's appearance.  However, testimony offered at the hearing indicates there were visible signs, such as the decreased fat stores, muscle tone, and the growth chart, it was a reasonable inference for the trial court to find based on the evidence.  *See In re D.W.P.*, 373 N.C. at 330; *In re G.G.M.*, 377 N.C. 29, 35 (2021).  Finding 29 is supported by sufficient evidence.

### 6.  Conclusion of Neglect

We now must determine whether the trial court's findings support its conclusion that Indy was a neglected juvenile.

A juvenile is neglected when a parent "[d]oes not provide proper care, supervision, or discipline[,]" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15)(a), (e). "In order to adjudicate a juvenile neglected, our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re J.A.M.*, 372 N.C. at 9 (cleaned up). "Similarly, in order for a court to find that the child resided in an injurious environment, evidence must show that the environment . . . resulted in harm to the child or a substantial risk of harm." *In re K.J.B*, 248 N.C. App. 352, 354 (2016) (citation omitted).

In *In re S.W.*, this Court held a trial court properly concluded the parents neglected their infant because the parents did not provide proper care to their infant and the infant lived in an environment injurious to his welfare. 187 N.C. App. 505, 506–07 (2007). Evidence revealed that the infant had broken four ribs at least three weeks (but potentially eight weeks) prior to being taken to the hospital. *Id.* Crucially, the trial court found the broken ribs "would have caused [the infant] to cry when he was lifted or moved about." *Id.* at 507. We concluded that the parent's failure to obtain medical attention, either by their failure to notice the injury or by ignoring the injury, amounted to neglect under our General Statutes. *Id; see also In*

*re C.P.*, 181 N.C. App. 698, 704 (2007) (affirming adjudication of neglect in part due to mother's delay in seeking medical care for child).

The trial court's conclusion that Indy is neglected is supported by the findings. The findings reflect that Indy was visibly malnourished due to improper feeding which occurred over the course of a month, this malnourishment amounted to a "failure to thrive," Father was derelict in his medical duties prior to taking Indy to her pediatrician despite Indy's appearance, and Father did not act appropriately in response to Indy's medical situation once he learned of the severity.

Like in *In re S.W.*, Father's failure to recognize Indy's visible malnourishment (and only sought medical attention due to concerns over her congestion/allergies) and then his delay of seeking prompt emergency medical attention following Triad Pediatrics' recommendation supports the ultimate findings that Father failed to provide proper care by placing Indy at a substantial risk of harm and living with Father placed Indy in an environment injurious to her welfare. Thus, these ultimate and evidentiary findings support the trial court's adjudication of neglect.

Moreover, the cases put forward by Father are inapposite as they deal with single instances of neglectful behavior whereas here the malnourishment occurred for roughly a month. *Compare In re Stumbo*, 357 N.C. 279, 288 (2003) (single incident of caretaker negligence did not amount to neglect) *with In re S.W.*, 187 N.C. App. at 507 (infant was neglected after parents' failure to recognize infant's ribs had been broken for approximately three to eight weeks).

Therefore, the trial court did not err in adjudicating Indy neglected.

## C. Neglect of Nolan

Next, Father argues the trial court erred by adjudicating Nolan neglected due to Indy's neglect and Nolan's exposure to domestic violence.

### 1. Statements Offered Under Rule 803(24)

Father challenges Findings of Fact 24 and 25, asserting these findings were based on inadmissible hearsay. Prior to the hearing, the trial court, by pretrial order, allowed statements by Nolan and Mason under Rule 803(24) and made several findings in doing so.[6] At the hearing, a social worker testified to the statements made by Nolan and Mason over Father's objection after the trial court admitted the statements when DHHS's counsel renewed her argument made in the pretrial order.

With respect to Rule 803(24), "[a]dmission of evidence under [this rule] is addressed to the sound discretion of the trial court and may be disturbed on appeal only where an abuse of such discretion is clearly shown." *In re M.A.E.*, 242 N.C. App. 312, 316 (2015) (citation omitted). Thus, there is reversible error when "the [trial court's] findings are not supported by competent evidence, or if the law was erroneously applied." *Id.* at 317 (citation omitted).

Hearsay statements, those statements that the declarant does not "ma[k]e . . . while testifying at the trial or hearing" and are offered "to prove the truth of the

---

[6] Mason is a pseudonym for Indy's half-sibling who is not subject to this appeal. Mason and Indy have the same mother, Mother, but different fathers.

matter asserted[,]" N.C.G.S. § 8C-1, Rule 801(c), are generally inadmissible, *see id.* § 8C-1, Rule 802. However, Rule 803(24) is our residual exception to the rule against hearsay. Specifically, it permits the admission of:

> [a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence.

*Id.* § 8C-1, Rule 803(24). The Rule also contains certain procedural requirements. *Id.*

Father challenges the "more probative" prong, but this argument fails. Father points to the trial court's discussion of the "not specifically covered by any [other] exceptions" prong in its pretrial order instead of the trial court's discussion on "more probative" prong. In the pretrial order, the trial court found:

> 18. The statements are more probative on the point for which they are offered than any other evidence which the [DHHS] could procure through reasonable efforts. It is detrimental to the welfare of the juveniles to require them to testify as it would potentially cause them to suffer anxiety, cause behavioral disruptions, and be overwhelming.

In *In re M.A.E.*, we concluded that a similar finding was sufficient for Rule 803(24) purposes. 242 N.C. App. at 319–20. That finding explained that testifying would: be detrimental to the juveniles' welfare and overwhelming, cause anxiety and behavioral disruptions, "negatively affect the juveniles[,]" and "could hamper the progress they

are making in therapy." *Id.* at 319. Accordingly, because Father does not challenge this finding, it is binding, *see In re J.M.*, 384 N.C. at 591, and the trial court did not abuse its discretion by admitting this evidence.[7]

### 2. Additional Evidence of Domestic Violence

Father challenges Finding of Fact 26. This finding explains the next steps a social worker took in her investigation, the results of a 911 call log from the parents' residence, and the discovery of a police report regarding a February domestic incident. Father also challenges a portion of Finding of Fact 29, that Mason and Nolan "were exposed to displays of domestic violence, which also places the juveniles in a living environment injurious to their welfare[.]"

Father argues the 911 call log and the police report were not properly *authenticated* and thus were erroneously admitted. Other admissible testimony cured any error (assuming it was error) in the trial court's introduction of the 911 call log and the police report. *See Van Landingham*, 283 N.C. at 603.

As noted above, Mason and Nolan's statements regarding Father and Mother's domestic violence were properly admitted. Likewise, after a social worker's

---

[7] Father also argues the trial court erred by failing to allow his trial counsel to impeach Nolan's out-of-court statement under Rule 806. *See* N.C.G.S. § 8C-1, Rule 806 (permitting impeachment of the declarant as if the declarant had testified). Assuming error, the record does not reveal *what* Father would have asked the social worker in his attempt to impeach Nolan. *See In re T.M.L.*, 377 N.C. at 374 ("An appellant must not only show error; he must show that the error was prejudicial." (citation omitted)); *see also Thompson v. Rock Barn Prop., Inc.*, 299 N.C. App. 143, 146 (2025) (explaining that it is the appellant's duty "to ensure that the record is complete"). As the record does not reveal the evidence Father sought to introduce, we cannot discern if the error was prejudicial.

testimony, Mother's mother ("Maternal Grandmother") testified about the 19 February 2024 domestic incident found in the 911 call log. Specifically, Maternal Grandmother testified that when she went to Mother's home, a police officer was present, Mother was "very upset," and that Mother told Maternal Grandmother that Father "choked her." Maternal Grandmother also testified that Mason was present and attempted to explain what occurred.

The portion of Finding of Fact 29 Father challenges explaining that Nolan was in an injurious living environment is better classified as an ultimate finding, *see In re G.C.*, 384 N.C. at 67, and this ultimate finding is supported by the evidentiary finding that Nolan was exposed to domestic violence between Father and Mother, *see In re J.W.*, 241 N.C. App. 44, 50 (2015) ("In determining whether a child is neglected, domestic violence in the home contributes to an injurious environment."). Therefore, the exposure of Nolan to Father's domestic violence contributes to an injurious environment, and thus the challenged portion of Finding 29 is sufficiently supported.

### 3. Conclusion of Neglect

We now turn to the trial court's conclusion that Nolan was neglected.

Again, a juvenile is neglected if they "liv[e] [in an] environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15)(e). Also, there must be "some physical, mental, or emotional impairment" or "a substantial risk of such impairment." *In re J.A.M.*, 372 N.C. at 9 (cleaned up). We must also determine whether the "evidence [shows] that the environment . . . resulted in harm to the child

or a substantial risk of harm." *In re K.J.B*, 248 N.C. App. at 354 (citation omitted). However, "a trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re A.J.L.H.*, 384 N.C. 45, 55 (2023) (citations and internal marks omitted).

Our General Statutes also explain that "[i]n determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home . . . where another juvenile has been subjected to . . . neglect by an adult who regularly lives in the home." N.C.G.S. § 7B-101(15). But "a court may not adjudicate a juvenile solely based upon previous [DHHS] involvement relating to other children," rather "there must be the presence of other factors to suggest the neglect . . . will be repeated." *In re E.H.*, 388 N.C. 100, 105 (2025) (cleaned up). "[T]hose 'other factors' can be circumstances surrounding the [neglect] itself that indicate other children in the home could face similar harm." *Id.* (citation omitted).

We believe trial court's findings support the conclusion that Nolan was neglected based on Father's neglect of Indy. In addition to the ultimate finding in Finding 27, the trial court gave an ultimate finding in Finding 29 stating that it was "the parents' inability to recognize that their actions were inappropriate for [Indy], which placed [Nolan] at a substantial risk of harm based upon the [parents'] failure to provide proper care to [Indy]." As seen by the trial court's findings, the parents' response to Indy's medical situation before and after her diagnosis suggested to the trial court that parents cannot appropriately navigate emergency medical situations,

thereby indicating that the neglect—Father's failure to provide proper care—will be repeated and that Nolan could face similar harm. *See id.* Due to this substantial risk of harm to Nolan, the trial court did not need to wait for Nolan to experience "actual harm." *See In re A.J.L.H.*, 384 N.C. at 55. Thus, under *In re E.H.*, the trial court's ultimate and evidentiary findings support the conclusion of neglect.

Also, "[i]n determining whether a child is neglected, domestic violence in the home contributes to an injurious environment." *In re J.W.*, 241 N.C. App. at 50; s*ee also In re T.M.*, 180 N.C. App. 539, 547 (2006) (affirming neglect adjudication after findings reflect the child was exposed to severe domestic violence). Thus, Nolan's neglect can likewise be seen by his exposure to Father's domestic violence. According to the findings, Nolan was required to go outside during incidents between Father and Mother, but could still hear "yelling, screaming[,] and banging noises." Relatedly, Finding 24 indicates that Father "hurts [Mother] a lot[ ]" and "chokes" her despite Mason's attempt to calm down the parents. Adding to this, Finding 24 reveals that Mason attempted to physically intervene, and during his attempt, "[Father] fell on [Mason] which made [Mason] fall onto the bed." The trial court also found that Father and Mother both "vehemently denied" the domestic violence. *See In re A.J.L.H.*, 384 N.C. at 55–56 (substantial risk of harm existed for unabused children when parents failed to recognize their conduct amounted to abuse).

The trial court's evidentiary findings regarding Nolan's exposure to domestic violence coupled with Mason's intervention and the parents' denial of the domestic

violence support the ultimate findings that Nolan was "in a living environment injurious to [his] welfare[,]" and was subjected to "a substantial risk of physical and emotional harm[.]" *See In re J.W.*, 241 N.C. App. at 50. Again, Nolan may not have experienced actual harm, but the trial court did not need to wait for the harm to occur. *See In re A.J.L.H.*, 384 N.C. at 55.

Based upon the properly supported ultimate and evidentiary findings, the trial court properly adjudicated Nolan neglected.

### D. Dispositional Findings and Statutory Mandates

Finally, Father contends trial court abused its discretion at the dispositional stage and also failed to follow G.S. 7B-911's requirements in entering a custody order regarding Nolan. We again disagree.

### 1. Dispositional Order Findings

With respect to the dispositional order, Father argues first Finding of Fact 49 is not supported by credible evidence and is not a sufficient reason to deny visitation. Then he argues it was "arbitrary and capricious" to award custody to Nolan's mother.

Our Supreme Court has clearly laid out the applicable standard of review when we review a dispositional order:

> [Appellate courts] review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence. The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion. An abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not

have been the result of a reasoned decision.

*In re A.J.L.H.*, 386 N.C. 305, 310 (2024) (citations omitted and alteration in original).

With respect to visitation, "[a]n order that removes custody of a juvenile from a parent . . . shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation." N.C.G.S. § 7B-905.1(a).

Finding 49 of the dispositional order states:

> It is in the best interests of the juveniles that visitation with [Father] remain suspended until he actively demonstrates through his engagement with [DHHS] and/or testimony, the additional parenting skills he purports to have acquired during his participation in the PATE program. [Father] has refused to acknowledge how his actions contributed to the juveniles being placed in the [DHHS]'s care. [Father] continues to deny the existence of domestic violence in his relationship with [Mother] and the impact that domestic violence had on his children. As of this hearing, visitation with [Father] would be contrary to the juveniles' health and safety.

The trial court received evidence and made findings regarding: Indy and Nolan's adjudication; how Father has failed to complete portions of his case plan; that Father has not taken responsibility for his actions; and Father's pending criminal charge stemming from "the nexus of this matter." We are thus bound by our decision in *In re N.L.M.*, where this Court affirmed the trial court's decision to deny a father's visitation as it was not in the best interests of his children due to the children's adjudications, the father's failure to complete his case plan and to obtain counseling,

and the father's pending criminal charge related to the abuse of his child. 283 N.C. App. 356, 376–77 (2022). We conclude it was not an abuse of discretion to continue to suspend Father's visitation. *In re A.J.L.H.*, 386 N.C. at 310.

Also, Father's argument that he "cannot demonstrate newly developed parenting skills when there is no visitation" is meritless in that it mischaracterizes what the trial court's order requires of him.[8]

### 2. G.S. 7B-911 Statutory Mandates

Finally, Father argues that the trial court's civil custody order failed to comply with G.S. 7B-911 by failing to make proper findings. We disagree.

In November 2023, a temporary order was entered pursuant to Chapter 50 providing both Father and Nolan's mother with joint legal and physical custody of Nolan and concluding that both parents "are fit and proper[.]" Months later, the trial court filed Nolan's juvenile petition, which then vested jurisdiction in the "juvenile court." *See, e.g.,* N.C.G.S. § 7B-200(a). Again, in the dispositional order, the trial court decided Father's visitation should remain suspended.

---

[8] In arguing that awarding Nolan's mother full custody of Nolan was "arbitrary and capricious," Father also challenges several "findings" in the *dispositional order* such as the "finding" that he is "not a fit and proper parent to have custody of [Nolan]" and that Father "has acted in a manner inconsistent with his constitutionally protected rights as a parent." We note these "findings" are actually conclusions of law. *See In re I.K.*, 377 N.C. 417, 421 (2021). To that point, "it is not the role of this Court to create an appeal for an appellant or to supplement an appellant's brief with legal authority or arguments not contained therein." *Thompson v. Bass*, 261 N.C. App. 285, 292 (2018). Being that Father has failed to argue how the trial court's actual findings do not support these conclusions or cite any legal authority in support of his argument, the argument is abandoned. *See* N.C. R. App. P. 28(b)(6).

The trial court also "found" "since the initiation of this matter[,]" Nolan has remained in his mother's physical custody, the two have "a loving relationship," Nolan's mother "is a fit and proper parent to have custody of [Nolan] and has demonstrated [ ] she can provide adequate care and supervision to [Nolan,]" and that "[Father] is not a fit and proper parent to have custody of [Nolan] and has not demonstrated [ ] he can provide adequate care and supervision to [Nolan]."

The trial court then concluded:

> 3. It is in the best interests of [Nolan] to be placed in the legal and physical custody of his mother pursuant to [G.S.] 7B-903.
>
> 4. It is in the best interest of [Nolan] that the legal and physical custody be granted solely to his mother, and that this matter be transferred to a Chapter 50 custody action pursuant to [G.S.] 7B-911.
>
> 5. The Court's jurisdiction, as it relates to [Nolan] should be transferred pursuant to [G.S.] 7B-911, [ ]50-13.1, [ ]50-13.2, [ ]50-13.5, and [ ]50-13.7.
>
> 6. The Court finds by clear, cogent, and convincing evidence that further review hearings regarding [Nolan] should be waived pursuant [to] [G.S] 7B-906.1(k)(n).
>
> 7. It is in the best interest of [Nolan] that visitation with [Father] remain suspended pursuant to [G.S.] 7B-905.1.

And in its decretals, the trial court granted sole legal and physical custody of Nolan to his mother; transferred Nolan's matter to a Chapter 50 action pursuant to G.S. 7B-911, directed Nolan's mother's attorney to draft a custody order compliant with Chapter 50 to be entered by the court; and relieved DHHS, the GAL, and Nolan's

mother's attorney of further duties (as related to Nolan) upon entry of the dispositional order and the Chapter 50 order. Finally, the trial court decreed that its "jurisdiction in [Nolan's] juvenile proceeding . . . is hereby terminated pursuant to [G.S.] 7B-201 effective upon the entry of the [G.S.] 7B-911 Civil Custody Order described herein." Eventually, the civil custody order was filed 7 October 2025 in the underlying civil custody action between Father and Nolan's mother.

We believe that the dispositional order complied with the statutory requirements of G.S. 7B-911, and thus properly transferred the matter back to the underlying civil custody action and terminated the trial court's juvenile jurisdiction.

Our General Statutes provide that "[w]hen the court obtains jurisdiction over a juvenile, jurisdiction shall continue until terminated by order of the court, until the juvenile reaches the age of 18 years or is otherwise emancipated, or upon the juvenile's death, whichever occurs first." N.C.G.S. § 7B-201(a). General Statute 7B-911 authorizes a trial court to terminate juvenile jurisdiction and transfer the matter to a civil child custody action in certain circumstances.

However, "if the juvenile is already the subject of a custody order entered pursuant to Chapter 50," "[w]hen entering an order under [G.S. 7B-911]" the trial court is required to make "findings and conclusions that support modification of [the

existing custody order] pursuant to G.S. 50-13.7." N.C.G.S. § 7B-911(c)(1).[9] For its part, G.S. 50-13.7(a) states that a custody order "may be modified or vacated at any time upon motion in the cause and a showing of changed circumstances by either party[,]" meaning that there must be a "substantial change of circumstances affecting the welfare of the child[,]" *Durbin v. Durbin*, 388 N.C. 55, 61 (2025) (citations omitted). And "[w]hen the court enters a custody order under [G.S. 7B-911], the court shall [ ] cause the order to be filed in [the] existing civil action relating to the custody of the juvenile[.]" N.C.G.S. § 7B-911(b).

Moreover, we have recently clarified that we assess whether the trial court terminated its juvenile jurisdiction by looking at the juvenile order as opposed to the civil order. *See In re A.C.*, 2026 WL 890453, *3 n.2 (N.C. Ct. App. 2026) ("Because it is for the juvenile court, not the district court entering the Chapter 50 custody order, to terminate the juvenile court's jurisdiction . . . we must view the purported termination of the juvenile court's jurisdiction as stemming solely from the [juvenile] order."); *see also Fitzgerald v. Fortner*, 296 N.C. App. 338, 343 (2024) ("Thus, [G.S.] 7B-911 'requires that the *juvenile* court enter a permanent order prior to termination of its jurisdiction[.]' " (emphasis added) (citing *Sherrick*, 209 N.C. App. at 169)) .

---

[9] The trial court must make two other findings regardless of whether there is an existing custody order. N.C.G.S. § 7B-911(c)(2). While Father has abandoned any argument regarding those requirements, N.C. R. App. P. 28(b)(6), we note the trial court made the required G.S. 7B-911(c)(2)(a) finding in both the dispositional and civil orders, and G.S. 7B-911(c)(2)(b) is not applicable. Also, both orders indicate the trial court sought to terminate and transfer jurisdiction. *Cf. Sherrick v. Sherrick*, 209 N.C. App. 166, 170–71 (2011) ("[T]he order does not even state that the juvenile court is terminating its jurisdiction.").

Whether an order complies with statutory requirements is an issue we review de novo. *In re S.M.L.*, 272 N.C. App. 499, 517 (2020) (citation omitted).

The parties debate whether the fact that the November 2023 order was a "temporary order" alleviated the trial court from the requirement of finding there was a substantial change of circumstances. *See, e.g., Regan v. Smith*, 131 N.C. App. 851, 852–53 (1998) (distinguishing between temporary and permanent custody orders and explaining modification to the latter requires a substantial change of circumstances). The November 2023 order states it "is a temporary order without prejudice to either party[;]" thus it is temporary. *See Lawrence v. Lawrence*, 294 N.C. App. 355, 361 (2024) ("This Court has held that the inclusion of the express language 'without prejudice' is sufficient for an order to be deemed as temporary." (citation omitted)).

However, G.S. 7B-911(c)(1)'s mandate that the order comply with the modification requirements of G.S. 50-13.7 necessitates a determination of whether there has been a substantial change in circumstances. *Accord Durbin*, 388 N.C. at 56 ("In child custody matters, after the trial court enters a custody order, that order is only subject to modification in the face of a substantial change in circumstances affecting the welfare of the child." (citing N.C.G.S. § 50-13.7)).

We conclude the trial court's findings determined there was a substantial change in circumstances; therefore, the trial court properly terminated its juvenile jurisdiction and transferred the matter to the civil action.

In *Raynor v. Odom*, 124 N.C. App. 724, 733–34 (1996), our Court concluded the

trial court implicitly found there was a substantial change in circumstances sufficient to discharge its duty under G.S. 50-13.7. In that case, the trial court concluded that the plaintiff was "a fit and proper parent" in an earlier order but later concluded she was unfit in the appealed order. *Id.* at 734. We affirmed the trial court, reasoning that the change from "fit" to "unfit" was a "substantial change in circumstances." *Id.*

Here, the November 2023 order concluded that "[b]oth [Father and Nolan's mother] are fit and proper to exercise joint legal and physical custody of [Nolan]."[10] In the dispositional order, the trial court concluded that Nolan's mother was fit "to have custody of [Nolan,]" but that Father was unfit.

As mentioned above, Father abandoned any argument regarding the conclusion as to his fitness, but for the sake of our review, we elect to examine whether the conclusion is properly supported. The conclusion of unfitness is supported by the trial court's findings that Nolan was adjudicated and Father has "continue[d] to blame [DHHS] as the reason for the juveniles being in custody[ ]" and "to deny the existence of domestic violence in his relationship with [Mother] and the impact that domestic violence had on his children[,]" which are in turn supported by the evidence offered at the dispositional hearing. *See In re N.T.*, 289 N.C. App. 149, 160–63 (2023) (holding conclusion of unfitness was supported by findings revealing "that the circumstances which led to the removal" of the children and the children's

---

[10] *See In re I.K.*, 377 N.C. at 421; *In re B.R.W.*, 278 N.C. App. 382, 405 (2021) (describing "unfitness" as a conclusion of law).

adjudications "have [not] been adequately corrected" despite the parent's opportunity to address and examine the circumstances).

Accordingly, we are bound by *Raynor* and the trial court impliedly concluded there was a substantial change of circumstances.

Additionally, while the civil order did not contain all of the findings contained in the dispositional order, that order finds that the juvenile court adjudicated Nolan neglected and Father "adamantly denies any domestic violence in any relationship." The civil order's findings, then, support the conclusion of Father's unfitness. *See id.*

To that end, the trial court discharged its duties under G.S. 50-13.7 and therefore followed the statutory mandates of G.S. 7B-911 under both the dispositional order and the civil order.[11]

### III.    Conclusion

In light of the forgoing, the trial court's inquiry of Father was not biased or hostile, and the court did not commit prejudicial error regarding the Google search, even assuming the refusal to include the search amounted to error. The trial court also properly adjudicated Indy and Nolan neglected. We further conclude the trial court properly followed the statutory mandates for transferring Nolan's matter from

---

[11] The trial court of course could have "enter[ed] one order [that] both terminates juvenile court jurisdiction and serves as the 'civil custody order' under Chapter 50, instead of two separate orders," provided that the "order still [includes] the proper findings of fact and conclusions of law required for each component of the order." *Sherrick*, 209 N.C. App. at 172 (citing *In re A.S.*, 182 N.C. App. 139, 142 (2007)).

Chapter 7B to Chapter 50.

AFFIRMED.

Judges GORE and STADING concur.

Report per Rule 30(e).